Elias Gonzalez GUERRA, Individually and on behalf of all other persons similarly situated, Plaintiff-Appellee,

v.

MANCHESTER TERMINAL CORPORATION et al., Defendants-Appellees,

Local 1581, International Longshoremen's Association, and International Longshoremen's Association, AFL–CIO, et al., Defendants-Appellants.

No. 73–1907.

United States Court of Appeals, Fifth Circuit.

July 31, 1974.

Rehearing and Rehearing En Banc Denied Oct. 18, 1974.

See also 5 Cir., 489 F.2d 635.

Gerald J. Goodwin, Houston, Tex., for defendants-appellants.

Stuart M. Nelkin, Houston, Tex., for Guerra.

Richard R. Brann, Houston, Tex., for Manchester Terminal.

Before THORNBERRY, GOLDBERG and INGRAHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case we face again the difficult problem of harmonizing and synchronizing overlapping statutory methods for combatting employment discrimination. We face also the question whether the protective umbrella supplied by the federal civil rights laws is broad enough to cover those who claim discrimination based on their status as aliens. Two of the three defendants—the union local and the union international —appeal various portions of a generally adverse decision by the district court. We affirm in part, reverse in part, and remand for further proceedings.

## I. THE SCENARIO—TRIPLE FEATURE

Most of the important details in the controversy are undisputed, the parties having submitted stipulated facts to the court below on cross-motions for summary judgment. From October 24, 1960, to January 10, 1967, plaintiff-appellee Guerra, a Mexican citizen lawfully residing in Houston, Texas as a registered alien, worked for defendant Manchester Terminal Corporation [Terminal]. During this entire period Guerra maintained his family in Mexico. Employees at Terminal's Houston facility worked in either the Cotton Compress and Warehouse Department [Compress] or the Dock and Commodity Department [Dock]. Initially Guerra worked in Compress, but in 1963 he was transferred to Dock, where he performed satisfactorily.

Defendant Local 1581, International Longshoremen's Association [Local], represents Terminal's employees in each department. A single labor agreement covers employees in both departments, and provides higher rates of pay for all eleven job classifications in Dock than for any of the forty job classifications in Compress. At the time of the events from which this litigation arose, Local limited its membership to United States citizens and to those who had declared their intention to become citizens. Guerra was not a member although most of the members were Mexican-Americans or Mexican Nationals.

As a result of contract negotiations during the summer of 1965, Terminal agreed to hire its employees through the union hiring hall and to give preference to United States citizens. In addition, the bargaining agreement extended hospitalization benefits to both the worker and his family for those employed in Dock, but limited the benefits to the worker alone for those in Compress. The union membership then voted to establish a hiring hall referral system under which the more desirable jobs in Dock went first to United States citizens, then to Mexican citizens with families residing in the United States. Any jobs open thereafter would go to Mexican citizens who, like Guerra, kept their families in Mexico.

On September 7, 1965, Terminal transferred Guerra from Dock back to Compress. This action, taken because of union insistence, triggered the litigation that is now before this Court. Guerra was told that he could not have permanent employment in Dock until he either became a United States citizen or moved his family from Mexico to the United States, and his place in Dock was taken by a Mexican-American with more seniority. Guerra continued to work in Compress until he voluntarily left Terminal's employ in 1967.

On October 7, 1965, Guerra filed an unfair labor practice charge with the National Labor Relations Board (NLRB). On May 28, 1971, the Board issued a complaint alleging unfair labor practices under section 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act [NLRA], 29 U.S.C. § 158 (b)(1)(A), (b)(2) (1970.) On October 27, 1971, the Administrative Law Judge recommended dismissing Guerra's complaint; however, on May 22, 1972, the Board reversed the Administrative Law Judge and ordered defendant Local to grant relief to Guerra. The Board then asked this Court to enforce its order. On February 19, 1974, a panel of this Court granted the Board's request that its order be enforced. NLRB v. International Longshoremen's Local 1581, 5 Cir. 1974, 489 F.2d 635.

Meanwhile Guerra proceeded along an alternate route. On March 5, 1966, nearly six months after his transfer from Dock to Compress, Guerra sent a letter to the Equal Employment Opportunities Commission [EEOC] protesting the transfer; on August 8, 1966, he filed his sworn charge with the EEOC, alleging the denial of rights under Title VII of the Civil Rights Act of 1964. On August 12, 1970, the EEOC found reasonable cause to believe that the named defendants had committed violations of the Act. Having received his notice of right to sue on December 16, 1970, Guerra filed the instant lawsuit in the United States District Court for the Southern District of Texas on January 6, 1971.

Guerra alleged that various policies and practices followed by defendants discriminated against him and other Mexican Nationals on the basis of national origin in violation of rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and by the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1] He sought declaratory and injunctive relief as well as back pay and attorneys' fees. By final order entered on November 6, 1972, the district court held that defendants had engaged in an illegal discriminatory practice.[2] After a March 1973 hearing on damages, the court (1) permanently enjoined all the defendants from giving job preferences based on the citizenship of an employee or the residence of the employee's family; (2) permanently enjoined defendants Local and International from requiring United States citizenship as a condition of membership in the union; (3) imposed back pay liability on defendants Local and International, jointly and severally;[3] and (4) ordered all de-

---

1. Guerra also alleged violations of the duty of fair representation owed to himself and the class, and invoked the court's jurisdiction pursuant to 29 U.S.C. § 151 et seq. The court did not pass on that portion of the complaint, and none of the parties has mentioned it on this appeal.

2. Guerra v. Manchester Terminal Corp., S. D.Tex.1972, 350 F.Supp. 529, noted in 8 Texas Int'l L.J. 403 (1973 and 6 Vand.J. Transnat'l L. 660 (1973).

3. The district court awarded plaintiff a joint and several judgment for backpay against all

three of the defendants, but granted defendant Terminal a judgment over against defendant Local and defendant International for any portion of the backpay that Manchester might be compelled to pay. Although defendant Manchester did not file a notice of appeal from the district court's decision, it did file a brief in this Court for the limited purpose of supporting the court's decision to center final responsibility for the backpay on its two co-defendants. See Part V, infra.

fendants to pay reasonable attorneys' fees and costs.[4]

## II. TITLE VII CLAIM

■ In Espinoza v. Farah Manufacturing Co.,[5] this Court held that an employer's refusal to hire an applicant because of her lack of United States citizenship did not fall within the prohibition of Title VII of the Civil Rights Act of 1964 against employment discrimination on the basis of national origin, 42 U.S.C. § 2000e–2(a)(1) (1970). On the authority of *Espinoza* the court below concluded that plaintiff-appellee-Guerra not entitled to relief under Title VII, reasoning that any discrimination against Guerra turned on his status as an alien and on the foreign residence of his family rather than on his national origin.

After the district court's decision, the Supreme Court affirmed our decision in *Espinoza,* Espinoza v. Farah Manufacturing Co., 1973, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287. The Court did note that Title VII protected aliens otherwise within its coverage from discrimination based on race, color, religion, sex, or national origin, and that a citizenship requirement might be unlawful if it were "but one part of a wider scheme of unlawful national origin discrimination" or had "the purpose or effect of discriminating on the basis of national origin." 414 U.S. at 92, 94 S. Ct. at 338, 38 L.Ed.2d at 293. The Court concluded, however, that Title VII did not apply to discrimination based solely on lack of United States citizenship. Like Mrs. Espinoza, appellee Guerra has failed to demonstrate that he suffered from discrimination based on

4. Guerra voluntarily left his job at Manchester Terminal Corporation almost two years before filing this lawsuit. Whatever doubts we might entertain regarding the standing of such a plaintiff to challenge as an individual employment practices continuing long after his departure are better reserved for another day. In the first place, although attacking the merits of the decision granting injunctive and declaratory relief against the job preference and union membership policies, appellants have apparently conceded Guerra's right to question those practices. Indeed, while insisting that the transfer from Dock to Compress was not a continuing violation, they have admitted throughout the proceedings that the other practices did continue long after Guerra departed.

In addition, Guerra filed the suit both as an individual and as a representative of a class composed of all Mexican Nationals who are or might be (a) employed by defendant Terminal, (b) represented by defendant Local, and (c) adversely affected by certain allegedly discriminatory practices. Despite the class-action label, the district court never entered an order determining the maintainability of the class as required by Rule 23 (c)(1) of the Federal Rules of Civil Procedure. Nor did it ever make any explicit reference to the class action aspect of the suit. On the other hand, though awarding back pay to Guerra alone, the court obviously intended its declaratory and injunctive relief to apply class-wide. Moreover, after initially protesting the class-action aspect of the case, the defendants apparently decided against further combat on the issue in the district court, and appellants have raised no objections relating to that portion of the case on appeal.

Judge Thornberry's opinion for the Court in Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441, suggests that the district judge made a satisfactory implicit determination that the case could be maintained as a class action insofar as it concerned continuing practices. Given the silence of the parties on the matter, we pretermit further consideration of the propriety of class-wide injunctive relief in this case. *See generally* Rosen v. Public Service Elec. & Gas Co., 3 Cir. 1973, 477 F.2d 90; Reed v. Arlington Hotel Co., 8 Cir. 1973, 476 F.2d 721; Huff v. N.D. Cass Co., 5 Cir. 1972, 468 F.2d 172, vacated, 1973, 485 F.2d 710 (en banc); Heard v. Mueller Co., 6 Cir. 1972, 464 F.2d 190; Danner v. Phillips Petroleum Co., 5 Cir. 1971, 447 F.2d 159; Hackett v. McGuire Bros., Inc., 3 Cir. 1971, 445 F.2d 442; Carr v. Conoco Plastics, Inc., 5 Cir. 1970, 423 F.2d 57; Johnson v. Georgia Highway Express, Inc., 5 Cir. 1969, 417 F.2d 1122; Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28; Oatis v. Crown Zellerbach Corp., 5 Cir. 1968, 398 F.2d 496; Kohn v. Royall, Koegel & Wells, S.D.N.Y. 1973, 59 F.R.D. 515; Hyatt v. United Aircraft Corp., D.Conn.1970, 50 F.R.D. 242; King v. Georgia Power Co., N.D.Ga.1968, 295 F.Supp. 943.

5. 462 F.2d 1331 (1972), *noted in* 51 Texas L.Rev. 128 (1972).

his national origin rather than on his status as an alien. We therefore affirm the district court's denial of relief under Title VII.[6]

### III. SECTION 1981 CLAIM: LIMITATIONS

Appellants make a broad-based attack on the district court's treatment of the portion of the case resting on 42 U.S.C. § 1981. We consider first the argument that Guerra's § 1981 claim was barred by limitations.[7]

■ As the district court recognized, when an action is brought for back pay or similar damages under a federal statute which contains no built-in limitations period, the federal district court must apply the statute of limitations of the state where it sits which would be applicable to the most closely analogous state action.

Franks v. Bowman Transportation Co., 5 Cir. 1974, 495 F.2d 398, 405. Boudreaux v. Baton Rouge Marine Contracting Co., 5 Cir. 1971, 437 F.2d 1011, 1017 n. 16. The court reasoned that the most appli-

---

6. Appellants have raised several procedural objections to the district court's treatment of Guerra's claim under Title VII of the 1964 Act. They argue first that the court should not have assumed jurisdiction over the International because the International was not named in either the complaint letter or the formal charge filed with the EEOC. They also contend that the district court erred in not holding that Guerra's Title VII cause of action was barred by his failure to file his complaint with the EEOC within ninety days of the alleged unlawful employment practice as required by the statute. (In 1972 Congress extended the ninety day period to 180 days. 42 U.S.C. § 2000e–5(e) (1974), amending 42 U.S.C. § 2000e–5(d) (1970). This extension of time is, of course, of no use to Guerra, since it was explicitly made applicable to charges pending on March 24, 1972, and all charges filed thereafter.)

We recognize that appellants have raised two important jurisdictional questions that have as yet received no definitive answer from this Court. Title VII requires that an individual who seeks to bring suit pursuant to the statute must first have filed charges with the EEOC. 42 U.S.C. § 2000e–5(e), (1970) as amended, 42 U.S.C. § 2000e–5(f)(1) (1972). Interpreting this requirement, several Circuits have held that liability can not be imposed on a party not charged before the EEOC, Williams v. General Foods Corp., 7 Cir. 1974, 492 F.2d 399, 404–405; LeBeau v. Libbey-Owens-Ford Co., 7 Cir. 1973, 484 F.2d 798; Bowe v. Colgate-Palmolive Co., 7 Cir. 1969, 416 F.2d 711, 719; Mickel v. South Carolina State Employment Service, 4 Cir. 1967, 377 F.2d 239, 241, cert. denied, 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166. At least one court, however, has suggested that the rule might be less than absolute, Macklin v. Spector Freight Systems, Inc.,

1973, 156 U.S.App.D.C. 69, 478 F.2d 979, 993 n. 25; accord, Taylor v. Armco Steel Corp., S.D.Tex.1973, 373 F.Supp. 885, 911–912.

As to the second question, we have previously had occasion to question whether the time limit for filing a complaint with the EEOC is truly jurisdictional, or whether once the EEOC has accepted and proceeded with a complaint, the question of timeliness of the charge should be foreclosed to later court challenge. Boudreaux v. Baton Rouge Marine Contracting Co., 5 Cir. 1971, 437 F.2d 1011, 1014 n. 6. But see Georgia Power Co. v. EEOC, 5 Cir. 1969, 412 F.2d 462; Weeks v. Southern Bell Tel. & Tel. Co., 5 Cir. 1969, 408 F.2d 228, 230–231. Moreover, Guerra argues that the district court correctly held that the filing of the charge with the NLRB tolled the running of the ninety day time limit. 350 F.Supp. at 532; cf. Culpepper v. Reynolds Metals Co., 5 Cir. 1970, 421 F.2d 888.

Answers to these two questions, however, will have to await another day. Since the district court was correct in holding that Guerra was outside the coverage of the 1964 Act, those other Title VII issues are not properly before us.

7. In Sanders v. Dobbs Houses, Inc., 5 Cir. 1970, 431 F.2d 1097, 1101, this Court explicitly confirmed the availability of both back pay and injunctive relief in § 1981 employment discrimination suits. Though not explicitly so confined, appellants' limitations argument must necessarily be directed only at the back pay award, which the district court based on the single, completed act of the transfer from Dock to Compress. As appellants concede, the hiring preference and union membership practices, targets of the injunctive relief, continued at least until the time the lawsuit was filed.

cable Texas statute of limitations would be either Vernon's Tex.Rev.Civ.Stat.Ann. art. 5527 (contract claims), or art. 5529 (claims not otherwise provided for), both of which allow four years. However, in Johnson v. Goodyear Tire and Rubber Co., 5 Cir. 1974, 491 F.2d 1364, 1378–1379, decided after oral argument in the instant case, this Court held that § 1981 actions for back wages brought in federal court in Texas are to be governed by Tex.Rev.Civ.Stat.Ann. art. 5526, which limits recovery of back pay to a two-year period. *Cf.* Franks v. Bowman Transportation Co., *supra,* 495 F.2d at 405–406. Thus the district court's conclusion regarding the limitations period applicable to Guerra's claim for back pay is no longer valid.

■ Guerra's claim for back pay is based on the September 7, 1965, transfer from Dock to Compress. We agree with the district court that the transfer was a single, completed act rather than a continuing act; thus under the two-year statute operating without interruption the claim would have been barred on September 7, 1967. The district court concluded, however, that the statute was tolled by the filing of a complaint with the EEOC on either March 5, 1966, or August 8, 1966.[8] We find ourselves in substantial agreement with that conclusion.

This Court decided in Boudreaux v. Baton Rouge Marine Contracting Co., *supra,* 437 F.2d at 1017 n. 16, that the filing of charges with the EEOC tolls the running of the statute of limitations under 42 U.S.C. § 1981. We recently reaffirmed this holding in Franks v. Bowman Transportation Co., *supra,* 495 F.2d at 406.[9] Appellants' argument to the contrary notwithstanding, we do not believe that the timing of Guerra's EEOC filing should alter the principle enunciated in *Boudreaux* and *Bowman.*[10]

8. In some circumstances it becomes necessary to decide whether a letter filed within the relevant time limit will suffice as a "timely charge" within the meaning of Title VII and the EEOC's regulations. *See* Georgia Power Co. v. EEOC, 5 Cir. 1969, 412 F.2d 462; Weeks v. Southern Bell Tel. & Tel. Co., 5 Cir. 1969, 408 F.2d 228, 230–231. Since the March 5 letter was itself untimely, the district court in the instant case did not have to face that issue and found it unnecessary to decide which of the two untimely filings, the letter or the sworn charge, would be considered the tolling event. We agree with the district court that whether the charge was filed on March 5 or August 8 is irrelevant to the disposition of the case.

9. *Accord,* Ripp v. Dobbs Houses, Inc., N.D. Ala.1973, 366 F.Supp. 205, 214; Henderson v. First National Bank, M.D.Ala.1972, 344 F.Supp. 1373, 1377; Buckner v. Goodyear Tire & Rubber Co., N.D.Ala.1972, 339 F. Supp. 1108, 1118, aff'd, 5 Cir. 1973, 476 F. 2d 1287. Other courts are split on this issue.

*Compare* Johnson v. Railway Express Agency, Inc., 6 Cir. 1973, 489 F.2d 525, 529–530, 531 (no tolling), cert. granted, —— U.S. ——,

94 S.Ct. 2639, 40 L.Ed.2d 232 (1974), *and* Jenkins v. General Motors Corp., D.Del.1973, 354 F.Supp. 1040, 1045–1046 (no tolling) *with* Macklin v. Spector Freight Systems, Inc., 1973, 156 U.S.App.D.C. 69, 478 F.2d 979, 994 n. 30 (tolling).

10. The district court held that Guerra's charge before the NLRB tolled the ninety day limit for filing a charge with the EEOC. 350 F.Supp. at 532. Appellants complain that combining this holding with the holding that the EEOC charge tolled the § 1981 period of limitations represents excessive and unreasonable bootstrapping.

Although we have held that the invocation of arbitration or other grievance remedies provided in a collective bargaining agreement tolls the running of the time limit for filing charges with the EEOC, *e. g.,* Hutchings v. United States Industries, Inc., 5 Cir. 1970, 428 F.2d 303, 308–309, neither this court nor any other has apparently yet determined whether the filing of unfair labor practice charges with the NLRB should have the same effect. It is a provocative question, but we find it unnecessary to answer it in the case at bar. As we have already indicated, the holding that Guerra was outside

Whether or not the timeliness of a charge filed with the EEOC is open to later court challenge in a Title VII suit, see note 6 *supra,* the issue has no relevance to the tolling consequences of the EEOC complaint on a § 1981 suit in a case like the one *sub judice.*

■■ If the EEOC rejects a charge as untimely, the complainant may fairly be charged with notice that the statute of limitations is running on any claims under 42 U.S.C. § 1981. When, however, the EEOC accepts an apparently untimely complaint and proceeds with it as though nothing were amiss, the complainant acts not at all unreasonably in relying on the tolling principle of *Boudreaux* and *Bowman,* and in deferring court action on possible claims under § 1981 until the EEOC proceedings have run their course.[11] It would be harsh indeed for him to learn subsequently that because viewed through the prism of judicial hindsight the EEOC complaint was defective *ab initio,* he will not be permitted to receive its anticipated tolling benefits for his § 1981 action. Such a result would mean that a grievant who prefers to begin with concilia-

tion rather than litigation must gamble his right to recover under § 1981 on the correctness of the administrative decision to proceed with the Title VII complaint. Draconian lotteries can hardly be reconciled with the generally beneficent remedial purposes of these civil rights statutes. Where the EEOC has, without objection to the timeliness of a charge, proceeded with it in the usual manner, the attempt to utilize the EEOC will toll the running of limitations applicable to 42 U.S.C. § 1981.[12]

Plaintiff-appellee argues that filing the unfair labor practice charge with the NLRB also tolled the running of limitations under § 1981. The question posed apparently has not been squarely decided in this Circuit; but congressional purpose and the goal of fairness to all parties would clearly be well served by adoption of this approach. In Burnett v. New York Cent. R.R., 1965, 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941, the Supreme Court suggested that solution to the problem of "determining whether, under a given set of facts, a statute of limitations is to be tolled . . ."[13]

the coverage of Title VII renders supererogatory the treatment of any other issues relating to the Title VII claim. In addition, our holding, *infra,* that the possible untimeliness of the EEOC charge is irrelevant to the tolling of the limitations period under § 1981 relieves us of the need to decide whether the EEOC charge was made timely by the NLRB charge.

11. Obviously Guerra could not, at least initially, have actually relied on *Boudreaux's* tolling principle. The Supreme Court revived the Civil Rights Act of 1866 in 1968, two years *after* Guerra began his trek through the EEOC. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189. This Court did not decide that 42 U.S.C. § 1981 reaches employment discrimination by private parties until 1970, Sanders v. Dobbs Houses, Inc., *supra;* and we did not announce the *Boudreaux* tolling principle until 1971. Nevertheless, nothing in those decisions indicates that their benefits were to be given only prospective application, and we see no reason to treat Guerra any differently than we would a complainant who has had the benefits of our judicial wisdom from the outset.

12. To the argument that the opposite result might encourage the EEOC to give closer attention to the congressionally mandated time limit for filing complaints, we reply only that punishment of the individual, private grievant seems an unsatisfactory carrot for encouraging the EEOC to put its administrative house in order. If any house cleaning is necessary, sticks applied directly to the EEOC would prove more efficacious, and more just.

13. 380 U.S. at 426, 85 S.Ct. at 1053, 13 L. Ed.2d at 944.

In *Burnett* the Supreme Court faced the question whether the statute of limitations which apparently barred plaintiff's F.E.L.A. claim in federal court had been tolled by the plaintiff's timely but unsuccessful attempt to litigate first in state court. This Court has read the language relating to statutes of limitations and tolling provisions as having been broad applicability beyond the particular facts of *Burnett,* and has specifically relied on it in other civil rights cases. *E. g.,* Mizell v. North Broward Hosp. Dist., 5 Cir. 1970, 427 F.2d 468, 474 (42 U.S.C. §§ 1981, 1983, 1985); Culpepper v. Reynolds Metals Co., 5 Cir. 1970, 421 F.2d 888, 892 (Title VII).

must be sought in legislative intent: "[T]he basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." 380 U.S. at 427, 85 S. Ct. at 1054, 13 L.Ed.2d at 945. And the search for the elusive quarry called congressional intent must be pursued, the Court said, in "the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." *Id.*

Because Congress enacted no specific statute of limitations applicable to 42 U.S.C. § 1981, we have no clear expression of legislative intent with which to work, and we must create procedural limitations on actions under the Act as a matter of judicial implication. Macklin v. Spector Freight Systems, Inc., 1973, 156 U.S.App.D.C. 69, 478 F.2d 979, 995, n. 30. At the same time, we must "ensure that the procedural limitations we impose are consistent with § 1981's underlying 'humane and remedial' policy." *Id.* Accordingly, we have already determined that the limitations period applicable to § 1981 is not totally inflexible, and may, for example, be tolled by the filing of a complaint with the EEOC under Title VII.

The determination that attempts to invoke the assistance of the EEOC should toll the § 1981 limitations period rested on our recognition that Congress intended Title VII to be an important, but not the only, weapon in the arsenal against employment discrimination.[14] We could find no expression of legislative intention to preempt or repeal § 1981, and in fashioning a means of reconciling the two statutes we eschewed *jurisdictional election or exhaustion of remedies* doctrines.[15] On the other hand, by using a tolling rule we could implement Title VII's policy of encouraging adjustment and settlement of grievances short of courtroom litigation through use of an administrative body with a developing expertise in problems of employment discrimination,[16] while at the same time preserving intact the recently revivified remedy of § 1981.

■■ This reasoning supplies a persuasive analogy in the instant case. This Court has clearly recognized the availability of the unfair labor practices provisions of section 8 of the National Labor Relations Act [17] to remedy certain types of employment discrimination based on factors such as race or citizenship.[18] Not all observers have applauded such a use of the NLRA,[19] and

14. *See* Beverly v. Lone Star Lead Const. Corp., 5 Cir. 1971, 437 F.2d 1136, 1140 n. 22; Sanders v. Dobbs Houses, Inc., *supra*; Local Union No. 12, United Rubber Workers v. NLRB, 5 Cir. 1966, 368 F.2d 12, 24, cert. denied, 1967, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99.

15. *See* Lee v. Southern Home Sites Corp., 5 Cir. 1971, 444 F.2d 143, 147 n. 2; Caldwell v. National Brewing Co., 5 Cir. 1971, 443 F.2d 1044, cert. denied, 405 U.S. 916, 92 S. Ct. 931, 30 L.Ed.2d 785; Boudreaux v. Baton Rouge Marine Contracting Co., *supra*, 437 F.2d at 1017; Sanders v. Dobbs Houses, Inc., supra.

16. *See* Macklin v. Spector Freight Systems, Inc., *supra*, 478 F.2d at 994 n. 30; Caldwell v. National Brewing Co., *supra*; Young v. Inc., *supra*, 478 F.2d at 994 n. 30; Caldwell 438 F.2d 757, 762–764; Beverly v. Lone Star Lead Const. Corp., *supra*.

17. 29 U.S.C. § 158 (1970).

18. NLRB v. International Longshoremen's Local 1581, 5 Cir. 1974, 489 F.2d 635; Beverly v. Lone Star Lead Const. Corp., *supra*, 437 F.2d at 1140 n. 22; Local Union No. 12, United Rubber Workers v. NLRB, *supra*; *accord*, Linscott v. Millers Falls Co., 1 Cir. 1971, 440 F.2d 14, 18–19 and n. 4; United Packinghouse, Food and Allied Workers, Int'l v. NLRB, 135 U.S.App.D.C. 111, 416 F.2d 1126, cert. denied, 1969, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179.

19. *See* Sherman, Union's Duty of Fair Representation and the Civil Rights Act of 1964, 49 Minn.L.Rev. 771 (1965); Silberman, The Search For an Effective Remedy in Employment Discrimination, N.Y.U. 23d Conf.Lab. 133 (1971); Note, Allocating Jurisdiction Over Racial Issues Between the EEOC and NLRB: A Proposal, 54 Cornell L.Q. 943 (1969). *But see* Bennett & Bennett, Labor Law Meets Title VII: Remedies For Discrimination in Employment, 6 U.Conn.L.Rev. 66 (1973); Boyce, Racial Discrimination and

at times the Board seems to have wielded the weapon with more reluctance than vigor. But under the decisions of this Court, section 8 of the NLRA, like Title VII, at least in theory, partially overlaps with 42 U.S.C. § 1981 and offers a complainant an alternative source of relief. We have no reason to suppose that the NLRA, any more than Title VII, was intended to repeal or preempt § 1981,[20] and election or exhaustion of remedies seems as inappropriate between the NLRA and § 1981 as it did between Title VII and § 1981. In addition, though the NLRB has both wider expertise and a broader arena of responsibility than the EEOC,[21] the NLRA, like Title VII, clearly expresses a congressional desire to channel problem solving through an expert administrative body with the hope that some grievances may be adjusted without resort to the courtroom.[22] Thus, as with the relationship between § 1981 and Title VII, a tolling rule appears to be one viable means of protecting both the § 1981 and the NLRA remedies without unnecessarily subordinating one to the other.

Finally, we can foresee no adverse consequences for the interests of defendants from extending the limitations period applicable to § 1981 by means of the tolling rule proposed by plaintiff-appellee. Speaking for the Supreme Court in *Burnett, supra,* 380 U.S. at 428, 85 S. Ct. at 1054, 13 L.Ed.2d at 945, Mr. Justice Goldberg described the policies underlying statutes of limitations:

> Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."
> . . . Moreover, the courts ought *to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.*
>
> This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights.

the National Labor Relations Act, 65 Nw.U. L.Rev. 232 (1970); Fuchs & Ellis, Title VII: Relationship and Effect on the National Labor Relations Board, 7 B.C.Ind. & Com.L.Rev. 575, 600 (1966); Leiken, The Current and Potential Equal Employment Role of the NLRB, 1971 Duke L.J. 833 (1971); Note, Jurisdictional Conflicts in Minority Employment Relations; NLRB and EEOC, 2 U.San Fran.L.Rev. 149 (1967).

20. This Court and others have recognized the overlapping, concurrent jurisdiction of Title VII and the NLRA in the area of employment discrimination. Beverly v. Lone Star Lead Const. Corp., *supra,* 437 F.2d at 1140 n. 22; Sanders v. Dobbs Houses, Inc., *supra,* 431 F.2d at 1100; Local Union No. 12, United Rubber Workers v. NLRB, *supra,* 368 F. 2d at 24 n. 24; *accord,* Macklin v. Spector Freight Systems, Inc., *supra,* 478 F.2d at 996–997; Fuchs & Ellis, *supra* note 19, at 598. *See generally* International Bhd. of Boilermakers v. Hardeman, 1971, 401 U.S. 233, 237–241, 91 S.Ct. 609, 28 L.Ed.2d 10, 16–18; Comment, A Matter of Wooden Logic:

Labor Law Preemption and Individual Rights, 51 Texas L.Rev. 1037, 1112–1114.

21. Even in the field of discriminatory employment practices the NLRB has expertise and the authority to order certain remedies not otherwise available, including (1) setting aside representation elections, (2) revoking a union's certification as bargaining representative, (3) departing from the contract bar rule by holding that an existing collective bargaining agreement will not bar a new representation election, and (4) refusing to consider racial distinctions in unit determinations. Fuchs & Ellis, *supra* note 19, at 599.

22. The NLRB itself has underlined the importance of private, nonjudicial adjustment of grievances through its own efforts to mesh its statutory jurisdiction over labor disputes with contractual grievance machinery such as arbitration provided by collective bargaining agreements. *See* Rios v. Reynolds Metals Co., 5 Cir. 1972, 467 F.2d 54, 58; Lodge No. 12 v. Cameron Iron Works, Inc., 5 Cir. 1958, 257 F.2d 467, 473.

When, as here, the plaintiff has actively and vigorously pursued the same basic complaint in a different forum, a defendant cannot complain of slumbering, stale claims, faded memories, disappearing witnesses, or lost evidence. Quite the contrary, at least one of these defendants has been on notice almost from the moment of the incidents giving rise to plaintiff's claim and has been defending its position ever since. To be sure, the burden of defending the same conduct in several forums may vex a defendant. But that burden, where it exists, is caused by Congress's creation of various independent remedies for one basic problem. It is not within our power to lessen that burden by limiting the viability and vitality of one or more of the remedies.

■■■ The conclusion that Guerra's pursuit of remedies under the NLRA and Title VII tolls the statute of limitations applicable to § 1981 does not quite end the problem of limitations. The record in this case shows that neither the charge filed with the NLRB nor the letter and complaint filed with the EEOC named appellant International Longshoremen's Association. Since resort to Title VII is not a jurisdictional prerequisite to suit under § 1981, we agree with the District of Columbia Circuit and the Seventh Circuit that a party not named before the EEOC can nevertheless be sued under § 1981. Williams v. General Foods Corp., 7 Cir. 1974, 492 F.2d 399, 404–405; Macklin v. Spector Freight Systems, Inc., *supra*; Waters v. Wisconsin Steel Works of International Harvester Co., 7 Cir. 1970, 427 F.2d 476, 485–488, cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151. On the other hand, at least in the absence of evidence of a closer relationship between the parties than appears here, we can see no compelling reason why charges prosecuted before the EEOC should have any tolling effect in other suits on a party not named in those charges. A party named before the EEOC and initially forced to defend its conduct under Title VII suffers no particularly damaging consequences if the § 1981 limitations period is extended by tolling. A party not named is in a different position: such a party may very much need the protection supplied by a period of limitations against stale claims, fading memories, disappearing evidence, and lack of notice.[23] We think the same reasoning applies to a party not named before the NLRB but later named as a defendant in a § 1981 suit.[24]

■■■ Our determination that appellant International is not affected by Guerra's NLRB and EEOC charges requires us to alter slightly the back pay liability imposed by the court below. As we have previously indicated, the district court based the liability for back pay on Guerra's September 7, 1965, transfer from Dock to Compress. Without tolling, the period of limitations on liability for that act under § 1981 ran out on September 7, 1967. Guerra filed his lawsuit in January 1971; accordingly, limitations bars liability for the transfer on the part of appellant International under § 1981, and that portion of the district court's order imposing re-

23. It may be that in the case at bar the International actually suffered no real prejudice from the delay, since its defense to Guerra's charge was the same as that presented by the Local. Nonetheless, that the two appellants in this case have proceeded arm-in-arm does not lessen the force of our argument; we can certainly imagine situations in which even close brothers might fall out over who is to bear the monetary brunt of responsibility for certain actions, where early notice to one alleged wrongdoer would severely handicap the ability of the other to present his theory of the case.

24. Like appellant International, defendant Terminal was not named in the charge filed with the NLRB. Thus the NLRB charge could have no tolling effect on the employer in the § 1981 suit. Defendant Terminal was, however, named in the EEOC charge, and therefore would be affected by the tolling power of that act. In any event, Terminal has not appealed the district court's finding that it, too, shared liability for the discrimination against Guerra.

sponsibility for back pay on the International must be reversed.[25]

## IV. SECTION 1981 CLAIM: OTHER ISSUES

Appellants also challenge the district court's decision on Guerra's § 1981 claim as a matter of statutory interpretation and on the merits. They argue that § 1981 is not applicable to aliens; that a suit based on the statute requires a showing of state action; and that Guerra failed to demonstrate that he was the victim of an act of discrimination within the prohibition of § 1981.[26] We need not linger long over these arguments.

Noting that the statutes that now appear as 42 U.S.C. § 1981 and § 1982 had their origin in section one of the Civil Rights Act of 1866,[27] appellants cite a number of cases for the proposition that both provisions are limited to remedying racial discrimination. It is hardly open to dispute that the 1866 Act "was de-

signed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein . . . ." Jones v. Alfred H. Mayer Co., 1966, 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189, 1205. See Georgia v. Rachel, 1966, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925. Moreover, the Supreme Court has indicated that one modern derivative of the Act, 42 U.S.C. § 1982, is aimed at racial discrimination affecting the right to purchase or lease property. Jones v. Alfred H. Mayer Co., supra. It does not necessarily follow that § 1981, another modern derivative, is also so limited.

In the first place, as the detailed study of the legislative history by the able district judge below demonstrates,[28] subsequent congressional action explicitly broadened the language of the portion of the 1866 Act that has become § 1981 to include "all persons"[29] in order to bring aliens within its coverage.[30] It is unnecessary to repeat the district court's

25. Guerra argues that since the discriminatory membership policy maintained by the International continued until the filing of this lawsuit, the International was properly within the district court's jurisdiction. We have already indicated that we see no limitations problems regarding liability for the continuing practices, and we likewise perceive no difficulty with the § 1981 jurisdiction of the district court over the named defendants.

Appellants suggest that even if the EEOC charge were timely, Guerra has failed to justify the delay of five years in filing the suit and therefore the "balancing of equities" requires dismissal. We have held that the doctrine of laches may be raised in both Title VII and § 1981 suits, and might bar a back pay award. E. g., Franks v. Bowman Transp. Co., supra, 495 F.2d at 406; United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, 923. We have also indicated that the question of laches must be presented first to the district court, which was not done in the case at bar. See Franks v. Bowman Transp. Co., supra, 495 F.2d at 406. Accordingly, we intimate no view regarding the applicability of the doctrine to this case.

Finally, we note that the district court assessed reasonable attorneys' fees and costs against each of the three defendants. We leave it to the district court to consider whether any alteration in appellant International's share of that assessment is justified in view of our holding that limitations bars liability on its part for the transfer.

26. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

27. Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27.

28. 350 F.Supp. at 533–536.

29. As it has since its passage, the statute that is now 42 U.S.C. § 1982 applies to "all citizens":

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

30. See Comment, Is Section 1981 Modified by Title VII of the Civil Rights Act of 1964?, 1970 Duke L.J. 1223, 1237–38.

legislative summary here. We have been unable to detect any significant flaws in the analysis, and we adopt that portion of the district court's opinion as our own. More important, as the district court also noted, the Supreme Court has explicitly indicated that this statute applies to aliens. Takahashi v. Fish and Game Commission, 1948, 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478, 1487. As recently as 1971 the Court, referring to 42 U.S.C. § 1981, noted that, "The protection of this statute has been held to extend to aliens as well as to citizens." Graham v. Richardson, 403 U.S. 365, 377, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534, 545.[31]

 Apparently conceding the possibility that § 1981 might apply to aliens, appellants next turn to the legislative history for support of their argument that the statute offers protection only against state action.[32] Whatever the merits of appellants' legislative archaeology, the decisions of this Court clearly foreclose their argument. We held in Sanders v. Dobbs Houses, Inc., 5 Cir. 1970, 431 F.2d 1097, that § 1981 extends to private discrimination in employment, and we have reaffirmed Judge Clark's cogent Sanders opinion many times since. E. g., Franks v. Bowman Transportation Co., supra; Johnson v. Goodyear Tire and Rubber Co., 5 Cir. 1974, 491 F.2d 1364, 1378; Belt v. Johnson Motor Lines, Inc., 5 Cir. 1972, 458 F.2d 443, 445; Caldwell v. National Brewing Co., supra, 443 F.2d at 1045; Boudreaux v. Baton Rouge Marine Contracting Co., supra, 437 F.2d at 1016–1017.[33] It is

---

31. *Takahashi* was a challenge to a World War II inspired state statute forbidding the issuance of commercial fishing licenses to aliens ineligible for citizenship. *Graham* was a challenge to state actions conditioning welfare benefits on the possession of United States citizenship or on residence as an alien within the United States for a certain number of years. In both cases the Court held that the statutes denied aliens the equal protection of the laws guaranteed them under the Fourteenth Amendment. *Accord*, Sugarman v. Dougall, 1973, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853.

Various lower courts have also concluded that § 1981, or its antecedents, applies to noncitizens as well as citizens. Roberto v. Hartford Fire Ins. Co., 7 Cir. 1949, 177 F.2d 811, 814, cert. denied, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1343; Lopez v. The White Plains Housing Authority, S.D.N.Y. 1972, 355 F.Supp. 1016, 1026; Mohamed v. Parks, D.Mass.1973, 352 F.Supp. 518; League of Academic Women v. Regents of University of California, N.D.Cal.1972, 343 F.Supp. 636.

32. Implicit in appellants' position we sense the suggestion that Congress could not have constitutionally extended § 1981 to cover private discrimination against aliens. Because the 1866 Act was passed pursuant to the Thirteenth Amendment, any modern offspring of that statute, e. g., 42 U.S.C. § 1982, could reach private discrimination. By contrast, though the original source for § 1981 may have been the 1866 Act, the genesis of the "all citizens" language according to the Revisors' Historical Note was the

Civil Rights Act of 1870. *See* Tillman v. Wheaton-Haven Rec. Assn., 1973, 410 U.S. 431, 439 and n. 11, 93 S.Ct. 1090, 35 L.Ed.2d 403, 410 and n. 11. Since legislative history and Supreme Court decisions, e. g., Strauder v. West Virginia, 1880, 100 U.S. 303, 25 L.Ed. 664, indicate that the 1870 Act rested on the Fourteenth Amendment, any of its descendents must apply only against state action. Thus, though § 1981 might reach both private and public discrimination based on race, constitutionally it can reach only public discrimination based on alienage. We respectfully decline to embrace that *reductio ad absurdum*. Whatever constitutional foundations motivated the legislators who extended § 1981's predecessor to aliens, the Supreme Court has on several occasions suggested that authority to do so could be found in Congress's exclusive constitutional power over immigration and naturalization. Graham v. Richardson, supra, 403 U.S. at 377, 91 S.Ct. 1848, 29 L.Ed.2d at 544–545; Takahashi v. Fish and Game Comm'n, supra, 334 U.S. at 419, 68 S.Ct. 1138, 92 L.Ed. at 1487. See Truax v. Raich, 1915, 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131, 135.

33. Appellants invite us directly to reconsider the *Sanders* result. Even if this panel of the court had the authority to take that step, which we do not, appellants have failed to supply any compelling reason to do so. We are certainly not alone in our conclusion that § 1981 reaches private discrimination. *Accord*, Macklin v. Spector Freight Systems, Inc., 1973, 156 U.S.App.D.C. 69, 478 F.2d 979, 993 & cases cited at 993 n. 26; *see* Larson, The Development of Section 1981 as a Remedy For Racial Discrimination in Pri-

very late in the day for disgruntled defendants to be questioning such an unequivocal holding by this Court.

As their final line of defense appellants offer the argument that no act of discrimination within the prohibition of § 1981 occurred. Assuming *arguendo* that § 1981 reaches private discrimination against aliens, they insist that under the work referral system in effect at Manchester Terminal Corporation Guerra's transfer was not based on his alienage. As they see it, family residence, not citizenship, was the primary distinction drawn among workers: "The important inquiry is whether Guerra would have been transferred because of alienage if his family had resided in the United States and the answer to that is a simple no." Brief for Appellants at 11.

Appellants have sought refuge behind a semantic Maginot Line. The relevant inquiry in the case *sub judice* is whether Guerra would have been transferred because of his family's residence if he had been a United States citizen, and the answer to that is a simple no.[34] To be sure, the immediate obstacle between Guerra and the preferred Dock job was his family's residence in Mexico; but the obstacle was placed in his path because of his Mexican citizenship. That other Mexican citizens, those with families residing in the United States, could and did overcome the obstacle does not alter the basic fact that only noncitizens of the United States were put to

the test.[35] Appellants may have softened the lines drawn by the citizenship requirement by distinguishing between classes of noncitizens; the difference in treatment nonetheless rested in the first instance on citizenship. That is exactly the sort of employment practice prohibited by 42 U.S.C. § 1981.[36]

## V. CONCLUSION

Two issues remain for our consideration. First, appellants challenge the decision of the district court to place ultimate responsibility for the back pay award on the Local and the International.[37] As appellants recognize, apportionment of the responsibility for equitable relief in a case such as this one falls within the sound discretion of the district court. We do not believe the court below in any way exceeded the wide latitude it had to contour the remedy to the equities of the case.

A union's role as a party to a collective bargaining agreement can be legally sufficient to impose back pay liability on the union if the agreement violates Title VII. Johnson v. Goodyear Tire and Rubber Co., 5 Cir. 1974, 491 F.2d 1364, 1381. The rule applies with equal force in suits brought under 42 U.S.C. § 1981. But, appellants protest, it takes two to tango in collective bargaining; the employer has an equal responsibility for the final decisions and must share the consequences of decisions made affecting the terms and conditions of employment. That argument pro-

vate Employment, 7 Harv.Rights—Civ.Lib.L. Rev. 56 (1972); Comment, Racial Discrimination in Employment Under the Civil Rights Act of 1866, 36 U.Chi.L.Rev. 615 (1969); Note, A "New" Weapon to Combat Racial Discrimination in Employment: The Civil Rights Act of 1866, 29 Md.L.Rev. 158 (1969).

34. As plaintiff-appellee notes, if family residence had really been the touchstone, the order of priority for jobs in Dock would have been first preference to those with families residing in the United States, second preference to all others.

35. Nor is it relevant here that Guerra was the only employee actually displaced by the new hiring preference rule.

36. Given a union composed predominantly of Mexican-Americans and Mexican Nationals intending to become United States citizens, we recognize the unlikelihood that Guerra's transfer resulted from his national origin, particularly since his place was taken by a Mexican-American. As to appellants' suggestion, Brief at 9, that Guerra lost his job to a man with more seniority, the stipulated facts in this case are that Guerra was transferred because he is a Mexican citizen whose family resides in Mexico.

37. *See* note 3 *supra.*

vides useful guidance in identifying the wrongdoers, but it is conclusional and largely irrelevant once a court passes the finger-pointing stage and begins deciding who is to bear the dollars and cents responsibility for righting the wrong.

In the case at bar, the stipulated facts clearly revealed the primary source of the stimulus that provoked Guerra's illegal transfer. Having secured the employer's consent to a hiring hall system, the membership of defendant Local then voted to create a preferential referral system for the more desirable jobs that would distinguish between United States citizens and aliens. The union then insisted that the employer honor the terms of the recently negotiated contract by transferring Guerra from his job at Dock to a less desirable job at Compress. This task accomplished, defendant Local executed the collective bargaining agreement. The entire incident is aptly summarized in one stipulation of fact: "Defendant Local Union caused . . . the Employer . . . to transfer the Plaintiff from the higher paying department to the lower paying department . . . .." Appendix at 40.[38]

We do not mean to intimate that all of the dirt in this case is to be found on union hands. The district court certainly did not think so, and we agree that the employer, too, violated the statute. Nor do we mean to suggest that employers can avoid paying for their civil rights violations by standing passively by as unions take the active role. We say only that because the undisputed facts of this case identify the unions, particularly the Local, as those principally responsible for plaintiff's loss of the Dock job, the district judge did not abuse his discretion in placing final responsibility for the monetary recovery at the feet of appellants.[39]

Finally, appellants contend that the district court should have deferred consideration of the case pending completion of the proceedings to enforce the NLRB decision. Where machinery—in this case that supplied by the NLRA—exists for fully and fairly adjudicating a complainant's rights, appellants urge, forcing a defendant into duplicitous, simultaneous, prolonged litigation in another forum over a matter involving the same factual situation and basically the same proposed remedy smacks of harassment and oppression.

The chord struck by this argument has been sounded elsewhere. As the war against discriminatory employment practices has intensified, commentators have faithfully catalogued the expanding number of weapons available to complaining combatants.[40] According to one observer, "a single factual situation may result in a charge of employment discrimination based on race which may be pursued under at least eight possible theories for relief in six different forums." [41] Inevitably, the methods for combatting employment discrimination fit together less as a seamless web than as a patchwork quilt of concurrent jurisdiction, overlapping remedies, and even uncomfortable and confusing gaps. The result has been a tangled briarpatch through which even the most intrepid guide may have difficulty advancing.

---

38. It is also apparent that in the calculus of equities the May 1972 decision of the NLRB that the Local and the International had committed unfair labor practices in the Guerra affair was of some significance.

39. We do not think the district court's view of this issue would be changed by our holding, *supra*, that the claim against the International is barred by limitations. The court held that the Local and the International were liable jointly and severally; the elimination of the resources of the International for contribution in no way diminishes the liability of the Local.

40. *E. g.*, Beard, Racial Discrimination in Employment: Rights and Remedies, 6 Ga.L.Rev. 469 (1972); Cohen & Freid, "Multiple Jeopardy" in Employment Discrimination Cases, 31 Md.L.Rev. 101 (1971); Herbert & Reischel, Title VII and the Multiple Approaches to Eliminating Employment Discrimination, 46 N.Y.U.L.Rev. 449 (1971); Note, Implementing Governmental Policy Against Racial Discrimination in Employment: Fair Employment Practice Laws, Title VII, National Labor Relations Act, and the Philadelphia Plan, 23 U.Fla.L.Rev. 157 (1970).

41. Beard, *supra* note 40, at 469.

We do not, of course, lack for a chorus outlining and evaluating the comparative advantages and disadvantages of the various remedies for the struggling protagonists.[42] Nor do we lack hardy and redoubtable engineers willing to suggest schemes for bringing some order out of the seeming chaos.[43] Notwithstanding the wealth of assistance supplied by others, however, it is the courts who in the first instance must resolve the difficult and perplexing problems created by the existence of so many alternate routes toward the same final goal. And because of the constitutional restraints on our authority, as well as our healthy respect for the dangers inherent in charting courses to provide safe passage in the future among shoals only dimly perceived, if at all, in the present,[44] our problem-solving must proceed in a less grandiose fashion.

After nearly a decade of experience with Title VII of the Civil Rights Act of 1964, courts have finally tailored some fairly definite principles for reconciling the procedures and remedies of that statute with those supplied

42. *E. g.*, Bennett & Bennett, *supra* note 19, at 74–80; Boyce, *supra* note 19; Leiken, *supra* note 19; Peck, Remedies For Racial Discrimination in Employment: A Comparative Evaluation of Forums, 46 Wash.L.Rev. 455 (1971); Comment, *supra* note 30, at 1230–31; Note, *supra* note 40, at 170–72, 179–80; Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1222–28 (1971); Note, Jurisdictional Conflicts in Minority Employment Relations: NLRB and EEOC, 2 U.San Fran.L.Rev. 149, 158–59 (1967).

43. *E. g.*, Beard, *supra* note 40, at 487; Cohen & Freid, *supra* note 40, at 130; Fuchs & Ellis, *supra* note 19; Leiken, *supra* note 19, at 848–49; Sherman, *supra* note 19; Note, Allocating Jurisdiction Over Racial Issues Between the EEOC and NLRB: A Proposal, 54 Cornell L.Q. 943 (1969).

44. For example, the res judicata or collateral estoppel effect of proceedings taken pursuant to one statutory remedy in subsequent actions under another might become an important issue. It seems clear that a prior adverse decision on an employment complaint under the NLRA or Railway Labor Act does not preclude suit under Title VII or § 1981. Tipler v. E. I. duPont de Nemours and Co., 6 Cir. 1971, 443 F.2d 125, 128–130; Taylor v. Armco Steel Corp., 5 Cir. 1970, 429 F.2d 498; Norman v. Missouri Pacific R., 8 Cir. 1969, 414 F.2d 73; Willis v. Chicago Extruded Metals Co., N.D.Ill.1973, 358 F.Supp. 848, 852. Nor does the result reached in arbitration under a collective bargaining agreement have res judicata or collateral estoppel consequences for a Title VII suit. Alexander v. Gardner-Denver Co., 1974, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed. 2d 147, 158 n. 10, 165; Franks v. Bowman Transportation Co., supra, 495 F.2d at 408; Hutchings v. United States Industries, 5 Cir. 1970, 428 F.2d 303. Nor does a settlement reached under a state remedial scheme bar as a matter of res judicata or collateral estoppel a suit under Title VII. Voutsis v. Union Carbide Corp., 2 Cir. 1971, 452 F.2d 889, 894.

On the other hand, the Supreme Court has held that

when an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.

United States v. Utah Const. & Mining Co., 1966, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642, 660. *See* 2 K. Davis, Administrative Law Treatise §§ 18.02, 18.03 at 566, 18.04 at 577. And this court has previously indicated that where remedies proceed in tandem, first in the administrative arena of the NLRB and subsequently in a separate lawsuit in court, collateral estoppel may be applied to previously litigated facts. Nix v. Fulton Lodge No. 2, 5 Cir. 1972, 452 F.2d 794, 797; H. L. Robertson & Assoc., Inc. v. Plumbers Local 519, 5 Cir. 1970, 429 F.2d 520; Painters District Council No. 38 v. Edgewood Contracting Co., 5 Cir. 1969, 416 F.2d 1081. *See* Note, 67 Michigan L. Rev. 824 (1969).

The case *sub judice* was tried on stipulated facts, so the problem caused by inconsistent fact findings on the same issue by two different tribunals remains largely speculative and theoretical. Moreover, since the plaintiff did not raise the issue of res judicata or collateral estoppel below, it is not actually before us on this appeal. 2 K. Davis, *supra*, § 18.04 at 569. We therefore have no occasion to essay the wisdom or desirability of using res judicata or collateral estoppel, in even a limited way, to link together remedies which Congress has created as separate and cumulative, to be administered by different bodies in different forms. *See* Beard, *supra* note 40, at 487; Cohen & Freid, *supra* note 40, at 130; Leiken, *supra* note 19, at 848 n. 96; Note, *supra*.

by grievance machinery in collective bargaining contracts. *See, e. g.,* Alexander v. Gardner-Denver Co., 1974, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147. Meshing Title VII with the unfair labor practice remedy has proceeded at a slower pace, and integrating each of those two with the only recently revived remedy of 42 U.S.C. § 1981 has scarcely begun. Some answers, albeit general ones, we have already supplied. We have focused here on the problem of limitations. Many more answers await future litigation. Even at this stage of the development of the law, however, our goal is clear: to mitigate the harshness to those accused of employment discrimination resulting from what one source has characterized as "multiple jeopardy," [45] while preserving and protecting for those complaining of discriminatory employment practices the full panoply of remedies guaranteed them by the federal laws.[46]

 In the case *sub judice* our task, like our view of the battlefield, is limited indeed. The simple answer to appellants' deferral argument is that whether or not the court could or should have deferred, it was neither requested to defer, nor was it required to do so.[47] If Title VII of the Civil Rights Act of 1964 appended no jurisdictional prerequisites or procedural limitations to 42 U.S.C. § 1981,[48] it is hardly likely that the NLRA did so. Moreover, if concurrent jurisdiction over employment discrimination exists between the NLRA and Title VII,[49] we perceive no reason why resort to the former should be a prerequisite to suit under § 1981. The three statutory remedies exist separately and independently, and employment discrimination may be prosecuted simultaneously in the courts and before the NLRB.

We understand that, as is sometimes the case, the simple answer, though sufficient, may be less than totally satisfying. We certainly need no extraordinary powers of divination to foresee that increased use of § 1981 by litigants and a more enthusiastic wielding of the unfair labor practice remedy against employment discrimination by the NLRB will raise the deferral issue or some variation of it again, especially where, unlike here, Title VII is also available as a remedy. Our recommendations in Caldwell v. National Brewing Co., *supra,* for melding the more general § 1981 remedy with the more specific Title VII policies and procedures might offer adumbrations of one possible answer. Beyond this, however, we need not go. In the war against employment discrimination our agony over tactical problems lying ahead of us must not force us to retreat

45. Cohen & Freid, *supra* note 40.

46. We emphasize that though Title VII, § 1981, and section 8 of the NLRA may overlap in the area of employment discrimination, their confluence must not be exaggerated. They are separate, independent statutes. The procedures under them vary; the available remedies may differ significantly; and, as the case at bar illustrates, conduct creating liability under one may not create liability under another. *E. g.,* Taylor v. Armco Steel Corp., *supra. See* Tipler v. E. I. duPont de Nemours and Co., *supra;* Fuchs & Ellis, *supra* note 19, at 597. In any event, it cannot be gainsaid that a plaintiff does not lose his right to an adjudication regarding the causes of action created by Title VII or § 1981 simply because the conduct of which he complains also offends section 8 of the NLRA. *Cf.* Alexander v. Gardner-Denver Co., *supra,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d at 159–161.

47. Ordinarily a reviewing court does not consider issues raised for the first time on appeal, except where a pure question of law is involved and a refusal to consider it would result in a miscarriage of justice. Evans v. Triple R Welding & Oil Field Maintenance Corp., 5 Cir. 1973, 472 F.2d 713, 716; D. H. Overmyer Co. v. Loflin, 5 Cir. 1971, 440 F. 2d 1213, cert. denied, 1971, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90; McCrea v. Harris County Houston Ship Channel Nav. Dist., 5 Cir. 1970, 423 F.2d 605, 610 n. 19, cert. denied, 1970, 400 U.S. 927, 91 S.Ct. 189, 27 L. Ed.2d 186. This case provides an example of the wisdom of that rule.

48. *See* Caldwell v. National Brewing Co., *supra;* Boudreaux v. Baton Rouge Marine Contracting Co., *supra;* Sanders v. Dobbs Houses, Inc., *supra.*

49. *See* note 20 *supra.*

from all battlefields. Rather, we must continue to evolve a strategy for deploying multiple skirmishes toward a common objective. Congress did not intend to channel all offensives through a single salient, and in this battle we approve maneuvers on two fronts.

On remand the district court should contour the relief awarded in this suit to that decreed in the NLRA suit to ensure that plaintiff-appellee tastes the fruit of his victory under each but does not enjoy any windfall or unjust enrichment from the overlapping remedies.[50]

Affirmed in part, reversed in part, and remanded.

50. *Cf.* Alexander v. Gardner-Denver Co., *supra*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d at 159 n. 14; Oubichon v. North American Rockwell Corp., 9 Cir. 1973, 482 F.2d 569; Bowe v. Colgate-Palmolive Co., 7 Cir. 1969, 416 F.2d 711, 715.