UNITED STATES of America, Plaintiff,

v.

STATE OF NEW JERSEY, et al., Defendants.

Civ. A. Nos. 77–2054, 79–184.

United States District Court, D. New Jersey.

Nov. 13, 1981.

Gerald F. George, Dept. of Justice, Federal Enforcement Section, Washington, D.C., for plaintiff.

Matthew Scola, Asst. Corp. Counsel for City of Newark, Newark, N. J., William Harla, Deputy Atty. Gen. for State of New Jersey, Trenton, N. J., for defendants.

SAROKIN, District Judge.

This case involves a claim of discrimination based upon the failure of the City of Newark to appoint certain fire cadets to the position of firefighters. The resolution of this matter requires a journey through the historical resistance of the City of Newark to admit minorities into the fire department.

According to the 1970 census, the population of Newark, New Jersey was 382,417, of whom 207,458 (54.2%) were black, and 27,443 (7.2%) were Hispanic. The Newark civilian labor force was 146,681, of whom 71,838 (49%) were black, and 7,403 (5%) were Hispanic. According to the 1980 census, the population of Newark was 58.2% black and 18.6% Hispanic.

As of August 1978, the Newark Fire Department had a force of 996 persons, of whom 64 (6.4%) were black and 4 (0.4%) were Hispanic. Only four of 182 persons in the first level supervisory rank of fire captain were black, and no black held a rank above fire captain. In the period from January 1, 1972 through May 1978, Newark appointed 124 persons to the rank of firefighter, of whom 6 (4.9%) were black, and 1 (0.8%) was Hispanic.

During the period from 1971 through 1979, the City of Newark established three programs which purportedly were initiated to increase the participation of minority persons in the Newark Fire Department. None of those efforts resulted in significant minority hiring in the Fire Department.

In 1971, the City utilized a federal grant to establish a fire cadet program which was limited to Newark residents and directed at minority and unemployed persons. Although the population of Newark was 60% minority at that time, 17 of the 22 fire cadets hired by the City in 1972 were whites. In 1974, the City utilized a federal grant to employ a group of 14 minority persons as fire cadets. It is this program which gives rise to this action. These persons successfully completed training as both firefighters and emergency medical technicians, with the expressed intent and assurance that they would become firefighters. Approximately 20 months after the cadets were hired, the City transferred the fire cadets from the fire department into another City department, thereby precluding the cadets from obtaining permanent firefighter positions through that program.

In August 1977, the City of Newark announced a bilingual (English-Spanish) examination for the position of firefighter in the Newark Fire Department. On September 21, 1978, an eligibility list for that examination was promulgated. Of 14 persons on the list, 12 were Hispanic and one was black. The City of Newark chose not to hire from that list until after the entry of the consent decree in this case in May 1980. Instead, it hired in the 1978–1980 period solely from an 80% white eligibility list.

In 1971, the Newark Fire Department established the position of fire cadet for persons between the ages of 17 to 21. Fire cadets were to receive firefighter training, were to be employed part-time as firefighters and also were to attend courses in fire science. They were to be made permanent firefighters upon completion of the cadet program. The program, which was federally funded, was intended to emphasize employment of minority and disadvantaged persons.

In 1972, the City of Newark hired 22 persons, five of them black, from the first eligible list for fire cadets. No additional fire cadets were appointed by Newark until February 1974. Of those cadets appointed in 1972, 20, including three blacks, completed the program successfully and received permanent appointments as firefighters on January 18, 1974 without taking a civil service examination.

In February 1974, ten persons, all black or Hispanic, were appointed as fire cadets in the Newark Fire Department. Three of those persons (Larry Douglas, John Reynolds and Dean Wilson) were then on the 1973 regular firefighter eligibility list for Newark. In August 1974, five additional persons were appointed as fire cadets in the Newark Fire Department. All of the fire cadets hired in 1974 were black or Hispanic.

Each of the fire cadets appointed in 1974, as the fire cadets appointed in 1972, successfully completed the six week basic firefighter training course required of all new firefighters. They also successfully completed the Emergency Medical Technician (EMT) course and bilingual training. They were then employed in the Newark Emergency Medical Services unit, working with and performing the same job as persons employed as firefighters in the Newark Fire Department. By virtue thereof and according to the testimony of the Director of the Fire Department, each of these persons was qualified for employment in the job of firefighter. From the outset, the Director of the Newark Fire Department and other responsible City and Fire Department officials on several occasions represented to the persons hired as fire cadets in 1974, that they would obtain permanent status as firefighters after serving one year as fire cadets.

The City of Newark, which had responsibility for the operation of the fire cadet program, modified that program at the time of the hiring of the 14 minority fire cadets in 1974. The City claims that the emphasis on training as emergency medical technicians was brought about by the terms of the federal grant. However, no evidence was submitted by the City which supported the contention that the difference in the 1971 program as compared to the 1974 program was prompted by any federal directive. On the contrary, the focus on emergency medical training appears to have been unilaterally initiated by the City itself. In 1975, because it determined that the City had substantially modified the original cadet program, the State directed that the City terminate the fire cadet program. The 14 persons remaining in the fire cadet program, all of whom were black or Hispanic, were given status as provisional emergency medical technicians.

By reason of the change in emphasis, the New Jersey State Department of Civil Service and the City of Newark agreed to phase out the fire cadet program in 1975, but still meet the City's commitment to the fourteen cadets/EMT's by holding an examination for the position of emergency medical technician open to all persons, including the fourteen minority provisional EMT's who had been hired originally as fire cadets. Subsequently, a one-time promotional examination was to be held for those cadets who became permanent EMT's and who wished to become firefighters. All of the fourteen former cadets were qualified as permanent EMT's as of November 1975. As the result of that arrangement, the cadets retained the opportunity to attain firefighter status.

In early 1976, the City of Newark transferred the administration of the Emergency Medical Service, including the fourteen EMT's, out of the Fire Department and into the Health and Welfare Department, although the Emergency Medical Service continued to operate out of Newark fire houses. Because it could not promote personnel from a position in one department to a higher position in another department, the State notified the City that the plan for phasing out the program could not be implemented.

Although the City of Newark could have reinstated the plan for the promotion of the cadet/EMT's to firefighter by transferring the EMT's back to the Fire Department and

requesting utilization of a civil service procedure for waiver of the competitive examination, the City did not attempt to utilize that procedure, despite the continuing inquiries from the EMT's in the period from 1976 until 1980 regarding their opportunity to become firefighters and the promises to that effect.

In 1978 and in early 1980, City officials, in response to inquiries about the cadet status, stated that nothing could be done because of the pending discrimination suit against the Fire Department.

It was the unilateral action of the City of Newark in modifying the cadet program which caused the State to require the phasing out of that program. It was the action of the City in transferring the administration of the program to the City's Department of Health and Welfare which deprived the State of the opportunity of implementing the plan to promote the fire cadets to the position of firefighter. It was the failure of the City to transfer the cadets back to the Fire Department or to otherwise seek to develop a plan to obtain firefighter status for the fourteen minority fire cadets which prevented the successful transfer of these cadets into the Fire Department and into the position of firefighters.

The City of Newark presented no reason why it could not have transferred the fourteen cadets back into the Fire Department for the purpose of implementing the agreement with the State, and the record indicates that no legitimate reason existed in view of the representations made by the City officials to the fire cadets; the cadets' demonstrated ability and training; and the fact that subsequent to the transfer in 1976, at least one Fire Department employee had moved laterally into and out of the Emergency Medical Service.

In August 1977, regular and bilingual (English-Spanish) examinations were announced for the position of firefighter in the Newark Fire Department. On June 8, 1978, an eligibility list was promulgated based on the regular firefighter examination. Of the 330 persons on that list, 67 (20.3%) were black and 8 (2.4%) were His-

panic. On September 21, 1978, a firefighter eligibility list was promulgated for Newark for persons bilingual in English and Spanish. Of the fourteen persons on that list, twelve were Hispanic and one was black.

In June and July 1978, the City of Newark appointed 57 persons to the position of firefighter, of whom 11 (19.3%) were black and one (1.7%) was Hispanic. By December 1979, the City of Newark had appointed a total of 103 persons from the 1978 firefighter eligibility list, of whom 15 (14.6%) were black and 2 (1.9%) were Hispanic. The City of Newark had the authority in making firefighter appointments in 1978 and 1979 to use in its sole discretion either the regular eligibility list or the bilingual eligibility list. However, the City chose not to make any appointments from the 1978 bilingual firefighter eligibility list prior to the settlement of this lawsuit in May 1980. Rather, during that period it hired firefighters exclusively from the regular list, which was almost 80% white.

Seven of the fourteen cadet EMT's applied for the 1978 Newark firefighter examinations:

George Stevenson
William Busby
Stephen Roberts
Dean Wilson
Charles Bishop
Ruben Contreras
Anthony Garcia

Four of these persons (Roberts, Wilson, Bishop and Garcia) placed on the 1978 regular eligibility list and two were appointed as firefighters. The two receiving appointments were Sephen Roberts on April 16, 1979 and Anthony Garcia on December 19, 1979.

The 1973 and the 1978 regular firefighter written examinations exhibited substantial adverse impact on black and Hispanic applicants. There is no evidence of the validity of those examinations as predictors of job performance.

Based upon the foregoing findings and the reasonable inferences therefrom, the court finds that the failure of the City of

Newark to place the fourteen black and Hispanic fire cadets hired in 1974 into permanent firefighter positions was based at least in part on racial considerations.

Regardless of the motivation for the City's actions, with regard to the fourteen minority fire cadets, the effect of the City's failure to take reasonable steps to obtain permanent firefighter appointments for those persons, and of its decision to hire untrained persons from the 1978 regular firefighter eligibility list was to disproportionately exclude qualified minority persons from firefighter employment, without a showing of business necessity.

This action was originally brought by the United States on October 5, 1977, alleging a pattern of discrimination on the basis of race and national origin by the State of New Jersey and, *inter alia*, the City of Newark in the employment of firefighters, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the nondiscrimination provisions of the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 1242 (the Revenue Sharing Act). The present controversy is before the court pursuant to the provisions for specific relief set out in the consent decree approved and entered in this suit on May 30, 1980.

This court has jurisdiction of this action under 28 U.S.C. § 1345, 42 U.S.C. § 2000e–6(b), and 31 U.S.C. § 1242. The State defendants and the City of Newark are employers within the meaning of 42 U.S.C. § 2000e and 31 U.S.C. § 1242, as amended. *United States v. New Jersey*, 473 F.Supp. 1199 (D.N.J.1979).

■ Title VII of the Civil Rights Act of 1964, as amended, prohibits any action which has the purpose or the effect of discrimination in employment on the basis of race or national origin. The statute prohibits not only overtly discriminatory acts or practices, but also those which, even though neutral on their face, disproportionately exclude blacks or Hispanics and are not shown to be justified by business necessity. *E.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971);

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The same legal standards apply to actions brought under the Revenue Sharing Act. *United States v. City of Chicago*, 549 F.2d 415, 439–40 (7th Cir. 1977), *cert. denied sub nom. Arado v. United States*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

■ Once a selection practice, device or procedure has been shown to disproportionately exclude blacks or Hispanics, it is the employer's burden to show that the device or procedure is valid or otherwise required by business necessity. *Griggs; Albemarle Paper Co.; Dothard*. A *prima facie* showing of a pattern of unlawful employment discrimination can be established by showing a substantial disparity between the makeup of an employer's work force and the labor pool from which the employer would reasonably be expected to draw its employees. *Teamsters v. United States*, 431 U.S. 324, 340 n.20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *United States v. Elevator Constructors Local 5*, 538 F.2d 1012, 1014–16 (3d Cir. 1976); *Boston Chapter NAACP v. Beecher*, 504 F.2d 1017, 1020, n.4 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

■ For positions such as firefighter, where the employer hires unskilled applicants and subsequently trains them for the position, the use of general population and labor force data is appropriate in establishing a *prima facie* showing of a pattern of discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Association Against Discrimination in Employment, Inc., v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981); *United States v. City of Chicago*, 385 F.Supp. 543, 548–49 (N.D.Ill. 1974); *Pina v. City of East Providence*, 492 F.Supp. 1240 (D.R.I.1980). The substantial disparity between the proportions of blacks

and Hispanics in the population and work force of the City of Newark and their proportions among the work force of the Newark Fire Department, and among the persons hired as firefighters in the period 1972–79 clearly establishes a *prima facie* case of a pattern of discrimination. *Teamsters*, 431 U.S. at 339–342 and n.43, 97 S.Ct. at 1856–1858; *Boston Chapter NAACP*, 504 F.2d at 1020.

■ Where a pattern of discrimination has been established, a qualified minority applicant who is denied employment is entitled to a presumption that the denial was based on impermissible considerations, and it is the burden of the employer to establish that the person would not have been hired even absent discrimination. *Teamsters*, 431 U.S. at 361–62, 97 S.Ct. at 1867–1868; *Association Against Discrimination*, 647 F.2d at 289; *Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496, 503–04 (2d Cir. 1980). The fourteen minority persons hired by the City of Newark in 1974 as fire cadets were promised eventual employment as firefighters, and, as the City admits, established by their successful completion of the fire academy program and their subsequent on the job performance, that they were interested in and well qualified for the position of firefighter. Accordingly, they are entitled to a presumption that the City's failure to provide such employment was based on impermissible racial considerations. That presumption is not rebutted by general claims of nondiscrimination by the City.

■ It is unlawfully discriminatory to provide different and less favorable treatment to qualified minority applicants than to white applicants. 42 U.S.C. § 2000e–2. The fourteen persons, all black or Hispanic, hired as fire cadets by the City of Newark in 1974 were treated differently and less favorably than the virtually all white group of fire cadets hired by the City in 1972, in that the members of the latter group obtained permanent appointment as firefighters, without testing, while the members of the former group, although they were promised promotion to the higher pay-

ing rank of firefighter and, as the 1972 cadets, received the same training as entry firefighters, were not so promoted but rather were maintained by the City in a lower paying position. The virtually all-white composition of the Newark Fire Department, the virtually all-white group of fire cadets hired by the City in an ostensibly minority-oriented program in 1972, and the similar failure of the City in 1978 to employ firefighters from the virtually all minority bilingual eligibility list, support the inference that the treatment of the 1974 cadets by the City was racially motivated conduct in violation of Title VII and the Revenue Sharing Act.

■ The decision by the City of Newark to hire from the 1978 firefighter eligibility list, which was 80 percent white, rather than to seek to appoint the fourteen already trained minority fire cadets to permanent firefighter positions, had a disproportionate adverse impact upon minorities and was not required by business necessity. Regardless of the motivation for the decision, that act constituted unlawful discrimination under Title VII and the Revenue Sharing Act.

■ The fourteen 1974 fire cadets demonstrated by their performance in that program that they were qualified for the position of firefighter. Accordingly, those cadets who were denied or delayed in obtaining permanent firefighter appointments by virtue of their performance on the unvalidated written test for firefighter were victims of discrimination in violation of Title VII and the Revenue Sharing Act.

■ The same standards under Title VII for liability and relief apply to both public and private employers, including liability for back pay awards, *Dothard*, 433 U.S. at 331 n.14, 97 S.Ct. at 2727; *Association Against Discrimination*; see *Gurmankin v. Costanzo*, 626 F.2d 1115, 1124 (3d Cir. 1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981); and are therefore applicable to the City of Newark.

■ It is proper for a court, in apportioning liability for monetary compensation,

to take into account the relative culpability of parties, where each party may be liable, but the discriminatory acts are more directly the responsibility of one party. *EEOC v. Enterprise Ass'n Steamfitters*, 542 F.2d 579, 587 (2d Cir. 1976), *cert. denied, Rios v. Enterprise Ass'n Steamfitters*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 655–56 (5th Cir. 1974).

■■■ The acts which resulted in the deprivation of the rights of the cadets were those of the City and not the State. In fact, the State is to be commended rather than condemned for its efforts, some of which were creative, to protect the cadets and permit them to achieve the goal promised to them and for which they had been trained.

Where as here, the City was responsible for the failure to appoint the fire cadets to permanent firefighter positions, and where the City, although admitting the qualifications of the fire cadets, rejected for several years, the opportunity to remedy that failure despite the efforts of the fire cadets and the pendency of this suit, it is appropriate that the City bear the financial burden of relief.

Relief under Title VII serves two purposes: to prevent future discrimination and to eradicate the continuing effects of past discrimination, including make whole the victims of the unlawful practices. *Teamsters*, 431 U.S. at 364, 97 S.Ct. at 1869; *Albemarle Paper Co.*, 422 U.S. at 417–18, 95 S.Ct. at 2371–2372; *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). See *Gurmankin v. Costanza*, 626 F.2d 1115, 1120–21 (3d Cir. 1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981).

■■■ Back pay and seniority relief are normally to be awarded to victims of discrimination, absent unusual and compelling circumstances. *Albemarle Paper Co.*, 422 U.S. at 421, 95 S.Ct. at 2373; *Franks*, 424

U.S. at 765–66, 96 S.Ct. at 1265. Such relief should include interest and pension benefits. *E.g., Association Against Discrimination* at 288; *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918 (10th Cir. 1979); *Rosen v. Public Service Electric and Gas Co.*, 477 F.2d 90 (3d Cir. 1973); *Kyriazi v. Western Electric Co.*, 476 F.Supp. 335 (D.N.J.1979); *EEOC v. Pacific Press Publishing Ass'n*, 482 F.Supp. 1291, 1319–20 (N.D.Cal.1979). "Moonlighting" earnings of the victim may be used to offset back pay only to the extent that the employer can show that the claimant would not have been able to work the second job, if he had in fact been hired by the employer. *Bing v. Roadway Express Inc.*, 485 F.2d 441, 454 (5th Cir. 1973).

■■■ It is the employer's burden to establish the existence of a disqualifying factor or other limitation on full back pay for a victim of discrimination. *Cohen*, 638 F.2d at 502. Uncertainties in the calculation of relief are to be resolved against the employer, not the innocent victim of his act. *Association Against Discrimination*, 645 F.2d at 289; *Cohen*, 638 F.2d at 502; *United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir. 1975),[1] *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

## CONCLUSION

The applicants received training as fire cadets and successfully completed the program. The officers in the Fire Department were impressed with the qualifications, abilities and dedication of these graduates. For reasons allegedly dependent upon the nature of the federal grant, the emphasis of the training was altered from firefighting to emergency medical services. However, no evidence was submitted by the City of Newark to support any such change in emphasis by the federal government. On the contrary, it appears that the nature of the training was changed unilaterally by the

---

1. The amount of the awards hereunder shall be referred to the magistrate for a hearing if the parties are unable to reach an agreement consistent with the foregoing principles of law.

City, and it rejected all accommodations offered by Civil Service to implement the original intention of permitting the cadets to attain firefighter status. The City cannot avoid its legal obligation and assurances to the cadets by its own change in curriculum, in assignment or in department. All of the changes in status which the City urges to justify its actions followed its unilateral alteration of the basic nature of the training program. No evidence was submitted to satisfactorily explain why the first cadet group (substantially white) received different training from the second cadet group (all minority).

It is difficult for this court to comprehend why Newark, the largest city in the state, with such a vast minority population, seeks to justify rather than acknowledge and eliminate its discriminatory practices. It is particularly difficult to understand in view of the conceded qualifications and competence of the subject cadets. If the rights of minorities cannot be protected and advanced in the state's largest city, in which the minorities are in the majority, what then of the rest of the state?

There is a distant and echoing bugle now heard in the land sounding the call for retreat from the battle against discrimination. If we are to preserve our democracy, these are not the times to retreat, but to advance the cause of civil rights.

For the foregoing reasons, plaintiff's motion for relief is granted. Counsel for plaintiff shall submit an appropriate Order to the court.