**Denis Lee CURLER, Plaintiff,**

v.

**CITY OF FORT WAYNE, Defendant.**

**Civ. No. F 82–298.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

June 29, 1984.

Kirby G. Moss, Torborg, Miller, Moss & Harris, Fort Wayne, Ind., for plaintiff.

Mitchell A. Sherr, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

LEE, District Judge.

This matter is before the court for decision on the merits. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, seeking damages resulting from alleged discrimination in employment. The court, having considered the entire record and being duly advised, hereby renders and enters the following Findings of

Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. Plaintiff, Denis Lee Curler, is an adult white male.

2. Defendant, City of Fort Wayne, is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.[1]

3. Plaintiff was hired by defendant City of Fort Wayne as a Seasonal Park Employee on April 12, 1976.

4. Plaintiff initiated this suit[2] on June 29, 1982, alleging, inter alia, that he was discriminated against on the basis of race because the City of Fort Wayne failed to promote him to the position of Kennel Worker at the Humane Shelter or, in the alternative, award him a permanent position as a Relief Utility Man at the Humane Shelter when he applied for said positions in the latter part of 1976.

5. During the relevant period, the City of Fort Wayne and the International Association of Machinists and Aerospace Workers were signatories to a Collective Bargaining Agreement (joint Exhibit 1), dated November 7, 1975, which incorporated several supplemental Memorandums of Agreement (hereinafter Collective Bargaining Agreement).

6. On July 15, 1976, a notice was posted throughout the city departments, pursuant to Article IX, section 6 of the Collective Bargaining Agreement, indicating that bids would be accepted for a vacancy position as Kennel Worker at the Humane Shelter. Since no permanent city employees placed bids for the position, another notice was posted on August 13, 1976, which opened the bidding to all city employees including seasonal part-time employees.

7. Four seasonal park employees, including plaintiff, submitted bids for the Kennel Worker position. Those other than plaintiff included: Thomas A. Walls, a white male hired by the City on May 3, 1976, Samuel L. Terry, a black male hired by the City on May 7, 1976, and James L. Davis, a black male hired by defendant City of Fort Wayne on April 19, 1976.

8. Under Article IX, section 1 of the Collective Bargaining Agreement, vacancies are to be filled on the basis of seniority if the applicant is otherwise qualified for the job.

9. After the bids were received, interviews were scheduled. Generally, the Superintendent of the Humane Shelter, a full-time employee of the city, conducted the interviews; but at the time of the Kennel Worker opening, the responsibility for interviewing had been assumed by Dr. McClead, the President of the Humane Commission. Dr. McClead, by his own testimony, had only rarely conducted interviews and had conducted interviews for vacancies at the Humane Shelter on only one other occasion.

10. At the time of the interviews, Dr. McClead had been a licensed veterinarian for over forty years having received a Doctor of Veterinarian Medicine degree from Ohio State University in 1933. Aside from being President of the Humane Commission, Dr. McClead was engaged in small animal practice in Fort Wayne.

11. Since plaintiff timely filed for the position as Kennel Worker at the Humane Shelter, he was informed by his Supervisor at the Park Department that an interview would be scheduled. On the date scheduled for his interview, August 30, 1976,

---

1. In 1972 Congress amended 42 U.S.C. § 2000e to include state and local governments under the rubric of employers subject to that Act. Accordingly, the same standards for liability under Title VII apply to both private employers and public employers like the City of Fort Wayne. See Dothard v. Alabama, 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977); see generally League of United Latin American Citizens v. City of Salinas Fire Dept., 654 F.2d 557 (9th Cir.1981); United States v. State of New Jersey, 530 F.Supp. 328, 335 (D.N.J. 1981).

2. Plaintiff retained counsel after this court granted appointed counsel's "Leave to Withdraw."

plaintiff clocked out of work early and rode his bicycle to Dr. McClead's office where the interviews were to be held. Two other applicants—Mr. Davis and Mr. Terry (both black)—were chauffeured to Dr. McClead's office in a Park Department truck by a park employee.

12. The interviews with respect to all applicants were substantially the same. All were short in duration and generally consisted of a discussion relating to the requirements entailed in the position as Kennel Worker.

13. The Kennel Worker position was a menial labor type job which did not require any special training or experience. As explained in the "Job Bidding Notice", the duties of the Kennel Worker were as follows:

Performs a variety of routine manual tasks in the care of animals at the shelter, such as preparing for and serving food, cleaning kennels and cages, and collecting and disposing of refuse. Assists in inoculations and adoptions. Escorts visitors through kennel and gives information. Destroys sick or unwanted animals and cremates bodies.

(Plaintiff's Exhibit 5). Under the heading of "Job Requirements", the "Job Bidding Notice" stated:

Be able to perform under adverse conditions. Duties pertaining to the operation of the Humane Shelter which may include cleaning, feeding, putting to sleep, and cremating animals.

(Plaintiff's Exhibit 5).

14. After explaining the duties and responsibilities of the Kennel Worker position to plaintiff, Dr. McClead inquired into Mr. Curler's experience with caring for animals and, in particular, dogs. Mr. Curler explained that he had had many dogs, both large and small and that he had worked at a pet store (The Sea Horse) while he was in high school. When asked by Dr. McClead as to whether or not he feared dogs, Mr. Curler responded in the negative asserting instead that he "respected them." All in all, the interview was short in duration, lasting only approximately ten minutes.

At the conclusion of the interview, plaintiff was informed that a decision with respect to the Kennel Worker position would be made in about a week.

15. Plaintiff understood that the Kennel Worker position consisted of menial labor including cleaning cages, caring for animals and. the like. Plaintiff, however, wanted to get in on the ground floor and, perhaps, advance from there to a position in the Humane Shelter which would entail more responsibility.

16. Some time between September 7 and 9, 1976, plaintiff learned through the "grapevine" that one of the other applicants had gotten the Kennel Worker position. Mr. Terry, a black man, was hired by the city, on September 5, 1976, to fill the Kennel Worker position despite the fact that he had the least seniority of all four bidders.

17. Upon learning of this event, plaintiff contacted Dr. McClead by telephone. After introducing himself, plaintiff was asked by Dr. McClead, "What color are you?" Plaintiff responded that he was white, whereupon Dr. McClead informed Mr. Curler that he did not receive the position because he appeared nervous.

18. At trial, Dr. McClead maintained his position that the reason plaintiff was not hired for the Kennel Worker position was because he appeared nervous. This assessment was made by Dr. McClead based upon his observation of the plaintiff at the interview and further upon Dr. McClead's observation of plaintiff in the parking lot immediately after the interview. According to Dr. McClead, plaintiff was in the parking lot and had his head on the hood of an automobile. Dr. McClead was of the view that Mr. Curler was upset.

19. Dr. McClead further stated that the decision to not hire plaintiff as a Kennel Worker rested solely upon his subjective belief that plaintiff appeared to have a nervous personality. Based upon his experience, a calm disposition was necessary for dealing with animals. More importantly, Dr. McClead was of the view that some

individuals, including plaintiff, would not be capable of assisting in the destruction of animals.[3]

20. At the time of the interview, Dr. McClead was unaware of an affirmative action program, if in fact one existed, and he was never told by anyone to hire a black for the position of Kennel Worker. Race simply was not taken into consideration. Rather, the decision was based upon his subjective assessment of the applicant's demeanor. In this respect, it is imperative to note that at the time of the interviews, Dr. McClead did not have any of the personnel records of the applicants before him to review. Rather, he was under the impression that all of the applicants chosen for an interview had been pre-screened and were generally qualified for the position.

21. Both plaintiff and Mr. Davis filed grievances with the union complaining about the decision to hire Mr. Terry for the Kennel Worker position. Part of the complaint arose from the fact that Mr. Terry had the least seniority of all the seasonal park employees who had applied for the position. As between plaintiff and Mr. Davis, plaintiff had more seniority with the City than did Mr. Davis. Mr. Davis, however, was a member of the International Association of Machinists Union while plaintiff was not a union member.

22. At first, nothing came of either plaintiff's or Mr. Davis' grievances and they appeared to have been rejected. Later, however, the situation took a turn in favor of Mr. Davis. On November 3, 1976, Mr. Davis' grievance was settled pursuant to an agreement between the defendant City of Fort Wayne through its Director of Personnel, Arthur Evans, and the International Association of Machinists Union acting through its Business Agent, James Huntine.

23. It appears that Mr. Davis was, ostensibly, given a position as Relief Utility Worker at the Fort Wayne Airport Authority in an effort to resolve the grievance.

Nonetheless, the record is undisputed to the extent that Mr. Davis, after resolution of the grievance, was employed as a Relief Utility Man at the Humane Shelter. It is further undisputed, as the testimony of Personnel Director Evans made clear, that the decision to place Mr. Davis into a position as a Relief Utility Man was done solely in an effort to informally resolve the grievance without going through excessive paper work. Also clear is the fact that at the time of the resolution of Mr. Davis' grievance, the Humane Shelter employed approximately thirteen to fifteen employees and that the need for another Relief Utility Man was less than certain. It appears from the record adduced at trial that the position of Relief Utility Man at the Humane Shelter was created in an effort to informally resolve the grievance Mr. Davis had filed. No job vacancy notices had been posted with respect to that position.

24. The requirements for a Relief Utility Man to an extent paralleled that of a Kennel Worker. The description of a Relief Utility Man is as follows:

*Definition*
Under supervision to perform a variety of routine manual tasks in the care of dogs and other domestic animals at the municipal shelter and to do related work as required, to assist the Humane Officer where needed.

*Examples of Duties*
Where needed, to pick up dead and injured animals, stray animals, receive dogs at animal shelter, cleans and disinfects kennels, cages, food trays, and water pans, collect and properly disposes of refuse, keeps trucks clean, keeps records on animals picked up and related work activities. Works in areas where needed.

*Education and Experience*
Any combination equivalent to completion of the tenth grade and some experience in the handling of and caring for domestic animals.

---

**3.** Dr. McClead also testified that it was his belief that blacks were more generally afraid of dogs than were whites.

*Knowledge and Abilities*

Knowledge of methods and practice used in the feeding and care of dogs, and other small animals, knowledge of appropriate methods for cleaning and maintaining kennels, ability to understand and follow oral and written instructions, concern for the well being of animals, ability to develop and maintain cooperative relationships with the public.

License needed—Valid Drivers License

(Plaintiff's Exhibit 29).

25. As the foregoing job description makes clear, the position of Relief Utility Man mirrored to a great extent that of the Kennel Worker position. There are, however, so far as present purposes are concerned, at least two important distinctions.

26. First, as the job descriptions make clear, the position of Kennel Worker as described in the Bidding Notice indicated that a Kennel Worker would participate in, or aid in, the euthanasia of animals. Conspicuously absent from the Relief Utility Man's description is any indication that such an employee would be required to aid in assisting the destruction of animals.

27. Second, the position of Relief Utility Man required that the applicant possess at least a tenth grade education or its equivalent and a valid driver's license while the Kennel Worker position listed no such requirements. The requirements for a driver's license and at least a tenth grade education is somewhat of an anomaly given the fact that the Kennel Worker position was more preferred in terms of both responsibility and salary.

28. The difference in educational requirements and the need for a valid driver's license for the Relief Utility Man, but not for the Kennel Worker position, is of great significance in this case. As indicated, it appears that the position of Relief Utility Man at the Humane Shelter was created in an effort to informally resolve the grievance of Mr. Davis. Mr. Davis, interestingly enough, had a tenth grade education at the time of his promotion to that position and had a valid driver's license. In this respect, Mr. Davis precisely fit the requirements, as if the position had been tailor-made.

29. Plaintiff, on the other hand, also possessed a valid driver's license at the time and, in addition, had attended Concordia High School and later received a graduate equivalency degree. In this respect, Mr. Curler was more qualified than was Mr. Davis. Notwithstanding the difference, Mr. Davis received the position as Relief Utility Man.

30. Throughout the entire episode relating to the job at the Humane Shelter, plaintiff made other efforts to secure employment as a full-time employee with the City of Fort Wayne. For example, on July 14, 1976, plaintiff submitted a bid after a vacancy was noticed for Greenhouse Helper. (Plaintiff's Exhibit 3). On August 18, 1976, plaintiff submitted a bid for Counselor and, when a vacancy was noticed for a Technician, plaintiff, on October 6, 1976, submitted a bid. These submissions, in the court's view, were in keeping with plaintiff's desire to attain a full-time position with the City, in an effort to ensure himself of some career opportunity instead of relying upon his employment as a Seasonal Park employee.

31. Plaintiff was qualified for both the Kennel Worker position and the Relief Utility Man position. Plaintiff's employment record throughout his employment with the City up until that time reflected no adverse information, and it appears that plaintiff was evaluated as a capable employee.

*Conclusions of Law*

This court has jurisdiction over the parties and the subject matter pursuant to 42 U.S.C. § 2000e–5(f). Plaintiff has complied with the procedural requirements of Title VII and, as a white, *see, e.g., McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), enjoys the protection of 42 U.S.C. § 2000e, *et seq.* This is an individual disparative treatment action in which plaintiff must demonstrate that he was discriminated against because of his race to establish a violation of Title VII. *See International*

*Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36, 97 S.Ct. 1843, 1854–1855, 52 L.Ed.2d 396 (1977). Plaintiff must prove that a forbidden employment practice was a force behind his not being hired in order to come within the protective ambit of Title VII. *Id.* Under Title VII, "what is prohibited is discrimination that is racially [or on the basis of color, religion, sex, or national origin] motivated." *Bradington v. International Business Machines,* 360 F.Supp. 845, 854 (D.Md.1973), *aff'd,* 492 F.2d 1240 (4th Cir.1974). Accordingly, the central focus of the court's inquiry is whether the City of Fort Wayne treated plaintiff less favorably than others because of his race. *See Furnco Construction v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). It is to that question which the court now turns.

█ The shifting burden of persuasion underlying Title VII litigation has oft been repeated by this court, and others, and may be summarized as follows. In order to succeed in this litigation, plaintiff must establish a *prima facie* case from which the court may infer a causal connection between plaintiff's race and defendants' refusal to hire. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Upon the establishment of a *prima facie* case, the employer must rebut the inference of a causal connection by articulating legitimate, non-discriminatory reasons for the action taken with respect to plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer articulates legitimate, nondiscriminatory reasons, the final burden then falls upon plaintiff to demonstrate that the reason given by the employer was in fact pretextual. *Id.; Furnco Construction Corp. v. Waters, supra.* With respect to the *prima facie* case, the United States Supreme Court in *McDonnell Douglas Corp. v. Green, supra,* held that a plaintiff could make a *prima facie* claim of employment discrimination by showing:

(1) that he belonged to a racial minority;

(2) that he applied and was qualified for a job for which the employer was seeking applicants;

(3) that, despite his qualifications, he was rejected; and

(4) that after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

█ There can be no doubt in this case but that plaintiff has proven a *prima facie* case of employment discrimination. In fact, the facts stipulated in the pre-trial order filed in this cause on September 20, 1983 indicate that three and one-half prongs of the four prong criteria set forth in *McDonnell Douglas* have been stipulated to by the parties. It is stipulated that plaintiff is a white male, that he applied for the position of Kennel Worker with the defendant, and that he was not hired for the position for which a person was eventually hired. Thus, the only portion of plaintiff's *prima facie* case which has not been stipulated to is that he was qualified for the job. Yet even aside from the apparent stipulation, the record wholly supports the conclusion that plaintiff has met his initial burden. First, plaintiff is white and, it is clear that Title VII of the Civil Rights Act prohibits racial discrimination in employment against whites on the same terms as racial discrimination against blacks. *McDonald v. Santa Fe Trail, supra.* Second, plaintiff was qualified. In this respect, the evidence at trial indicates that plaintiff had had extensive experience in handling animals and in particular dogs. This can be seen from the fact that during high school plaintiff worked at a pet store and further from the fact that plaintiff has owned many dogs both large and small. With respect to plaintiff's qualifications, it should be noted that the qualifications of those who ultimately obtained positions at the Humane Shelter during the relevant period were never made clear at trial and an inference to be drawn from the absence of such evidence is that plaintiff was at

least as equally qualified as those who obtained the positions plaintiff sought. Further, with respect to the later created Relief Utility Man position, it should be noted that plaintiff had both a high school equivalency degree and a driver's license. In this respect, the plaintiff was, at least by all outward appearances, more qualified than Mr. Davis. Third, despite being qualified, plaintiff was not offered a position. Fourth, after plaintiff was not selected, the Humane Shelter continued to seek applications and, in fact, created an extra position in the nature of a Relief Utility Man in an effort to appease a disgruntled applicant for the earlier posted Kennel Worker position.

■ Since plaintiff established a *prima facie* case, the burden, as indicated, shifted to the defendant to articulate a legitimate, non-discriminatory reason for its action in not hiring plaintiff. Defendant need not prove a non-discriminatory reason by the preponderance of the evidence. Rather defendant must only articulate some legitimate, non-discriminatory reason. The burden at this stage of Title VII litigation has been set forth on numerous occasions and was perhaps stated in its clearest terms by the United States Supreme Court in *Texas Dept. of Community Affairs v. Burdine*, as follows:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reason. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.

450 U.S. at 254–55, 101 S.Ct. at 1094 (citation omitted) (footnotes omitted); *see McDonnell Douglas, supra*, 411 U.S. at 804, 805, 93 S.Ct. at 1825, 1826.

In the present matter, the defendant, at trial, attempted to articulate legitimate, non-discriminatory reasons for not hiring plaintiff. In its attempt to articulate such reasons, defendant severed its evidence relating to the Kennel Worker position and its evidence relating to the Relief Utility Man position. As for the Kennel Worker position, the evidence of a legitimate, non-discriminatory reason related to the fact that Dr. McClead was of the view that plaintiff was "nervous" and as such would not be an adequate kennel worker insofar as such employees would be involved in the euthanasia of animals. And, with respect to the Relief Utility Man position, defendant suggested that the creation of such a position was nothing more than an attempt to appease the complaint aired by a member of the International Association of Machinist unions. Since defendant posed its rebuttal evidence in this framework, the court will accommodate the defendant in its analysis.

With respect to the Kennel Worker position,[4] the court has no trouble in finding

---

**4.** At this juncture, the court is compelled to note two things which relate to the demeanor and credibility of the witnesses which the court observed at trial. First, this court found Dr. McClead to be a wholly credible witness. Second, though plaintiff was labeled by Dr. McClead as being "nervous," the court notes that Mr. Curler was also a very credible witness. While plaintiff may have been "nervous" during the ten minutes interview for the Kennel Worker position, plaintiff's testimony from the witness stand was not overshrouded with a "nervous" appearance. To the contrary, plaintiff answered questions on both direct and cross-examination with little appearance of being "nervous." One would think that examination and cross-examination in a court such as this would propel "nervous" people to exhibit such symptoms, but no such exhibitions emanated from plaintiff during his testimony. Plaintiff's decorum is, of course, subsidiary to the issue of whether or not plaintiff was the object of discrimination. The foregoing is merely intended to suggest that the court found plaintiff's, as well as Dr. McClead's, testimony to be wholly worthy of credence. Where, of course, the testimony of those individuals is incongruous, the

that the defendant articulated a legitimate, non-discriminatory reason for not hiring plaintiff. The reason in this respect was simple—plaintiff appeared "nervous" and a person of such demeanor would not be apropos for putting animals to sleep. This court has no quarrel with Dr. McClead's testimony that those who assist in the euthanasia of animals should have a calm demeanor because those without such a propensity would perhaps frighten the animal to be destroyed.

In reaching this conclusion, the court recognizes plaintiff's contention that such an observation was made after a ten minute interview and, in that respect, seems presumptuous. Aside from the testimony relating to the interview, however, is Dr. McClead's testimony that after the interview plaintiff was seen leaning over an automobile apparently disturbed about something (which may or may not have been related to the just concluded interview). That observation buttressed Dr. McClead's conclusion that plaintiff appeared "nervous." [5]

The court further recognizes in reaching the above conclusion with respect to the Kennel Worker position, that (giving deference to plaintiff's testimony [6]), plaintiff upon calling Dr. McClead, was asked about his "color." While such a misguided question, insofar as it may have related to race was, perhaps, unfortunate, it nonetheless appears (upon full review of the evidence) that Dr. McClead's testimony relating to race was an unfortunate way in which Dr. McClead attempted to ascertain a superfi-

cial description of the caller. After all, Dr. McClead interviewed only four candidates—two of whom were white and two of whom were black. By inquiring into the "color" of the applicant, Dr. McClead was able to determine whether or not the given caller (here plaintiff) had received the position and if he had not, to explain why that applicant had not received the position. While unfortunately asking about race, it appears to the court that Dr. McClead had not matched "names" to "faces"—he merely had categorized the applicants and upon learning the applicant's race or "color" it was easier for him to determine whether the caller had received the position.

Thus, in total, the court is of the view that defendant has articulated a legitimate, non-discriminatory reason for not hiring plaintiff into the Kennel Worker's position. The court is more troubled, however, by defendant's evidence relating to the Relief Utility Man's position at the Humane Shelter.

As the findings make clear, Mr. Davis was hired into the Relief Utility Man position at the Humane Shelter. His hiring into that position, at the very least, is somewhat of an anomaly. Part of the anomaly stems from the fact that that particular position was non-existent before the whole episode relating to the Kennel Worker's position (and Mr. Terry's appointment thereto) came to light. Even more anomalous is the fact that the newly created position required that the applicant meet certain qualifications—that the applicant possess at least a tenth grade education

---

court, either in its findings or conclusions, accepts the testimony of the individual to whom it is attributed.

**5.** *See ante,* n. 4. Further, insofar as plaintiff suggests that the ten minute interview was an insufficient period in which to find that the applicant was nervous, this court has no reservation in concluding that a short, ten minute interview was sufficient for assessing the relative abilities of the particular applicant—particularly given the fact that Dr. McClead only interviewed four applicants (who in his view were at least minimally qualified). When the applicants were assessed, one against the other, it seems clear to the court that one of a "nerv-

ous" disposition could be disregarded in favor of one of a calmer demeanor. After all, every employment decision entails some subjective considerations. *See United States v. Hazelwood School District,* 534 F.2d 805 (8th Cir.1976), *vacated on other grds,* 429 U.S. 1037, 97 S.Ct. 730, 50 L.Ed.2d 747 (1977); *Stewart v. General Motors,* 542 F.2d 445 (7th Cir.1976); *Saracini v. Missouri Pacific Railway Co.,* 431 F.Supp. 389 (E.D.Ark.1977).

**6.** *See ante,* n. 4. Dr. McClead could not affirmatively state that he did not ask any questions relating to the "color" of the applicant. Instead he indicated that such an inquiry was possible.

and a valid driver's license. Interestingly enough, no such qualifications were required of the applicants for the Kennel Worker's position even though that position, both with respect to the amount of pay and relative responsibilities, was a better, more desirable position.

Mr. Davis met the requirements for the Relief Utility Man's position to the letter having both a tenth grade education and a valid driver's license. Mr. Curler was, however, equally, if not more, qualified for the position in that he possessed a high school equivalency degree and a valid driver's license.[7]

Despite Mr. Curler's better qualifications, defendant is of the view that legitimate, non-discriminatory reasons existed for Mr. Davis' employment as a Relief Utility Man. In this vein, defendant asserts that Davis received that job solely through an informal agreement between the City and the union to rectify what had apparently been some disgruntlement about the fact that the least qualified applicant had received the position as a Kennel Worker. Since Mr. Davis was a member of the union (IAM), defendant asserts that the creation of the Relief Utility Man position was nothing more than an attempt to resolve an informal grievance and in this respect constituted a legitimate, non-discriminatory reason for hiring him over plaintiff.[8]

The court might agree with such a contention were it not for the fact that Mr. Curler, more than any of the other applicants, had the most seniority. At trial it was established, both through the testimony of Mr. Evans (the former Director of Personnel for the City) and the exhibits relating to the agreement between the union and the City (Joint Exhibit 1 and Plaintiff's Exhibit 9) that in filling job vacancies, the principal concern related to the employee's qualifications. If qualified, then preference would be given to the applicant with the most seniority provided that the applicants were within the same employment status. That is, full-time employees took preference over part-time employees and part-time employees were given preference over new hires.

In the present matter, Mr. Davis was at least marginally qualified for the Relief Utility Man position.[9] So was plaintiff. Since both were qualified, under the terms of the agreement, the applicant with the most seniority was to be given preference.

It is indisputable that plaintiff had more seniority than did Mr. Davis. Plaintiff was hired as a Seasonal Park Employee on April 12, 1976. Mr. Davis was hired in a similar capacity one week later on April 19, 1976. Even aside from that, plaintiff remained a Seasonal Park Employee until the end of December 1976 or the beginning of January 1977 when he was laid off, while

---

**7.** It should further be noted that Dr. McClead who had interviewed Mr. Davis for the position of Kennel Worker, and who further was of the view that the job description for the Relief Utility Man's position was strikingly similar to that of the Kennel Worker's position, testified that in his view only Mr. Terry was acceptable for the Kennel Worker's position. In fact, plaintiff's Exhibit 14 suggests that Mr. Davis was wholly unacceptable in Dr. McClead's opinion:

James Davis was interviewed by Dr. McClead on 8/30/76 for the job of kennel worker along with 3 other applicants, but Dr. McClead said that Mr. Davis would not be acceptable for the job. Out of the 4 sent over, a Sam Terry was the only one that Dr. McClead said could be acceptable.

(Plaintiff's Exhibit 14).

**8.** The court is unpersuaded by defendant's argument about membership in the union as a legitimate, non-discriminatory reason. It is true that plaintiff was not a member of the IAM, but it was his unrefuted testimony that he was never approached to join the union. Moreover, it appears clear that at the time the agreement was reached about placing Mr. Davis into the Relief Utility Man's position, Indiana Code 22–6–4–5(3) made it an unfair labor practice for an employer to "discriminate in regard to hiring or condition of employment to encourage or discourage membership in any employees' organization." While that statute was repealed by Acts 1982, P.L. 3, Sec. 1, it was in effect at all relevant times and thus defendant's claim that union membership (or the lack thereof) was a legitimate reason for not hiring plaintiff into the Relief Utility Man's position must fail.

**9.** *See ante,* n. 7.

Mr. Davis was laid off November 1, 1976 with his last day worked being October 29, 1976. The position of Relief Utility Man was created effective November 3, 1976. Since seasonal employees had no binding seniority or recall rights after layoff (Plaintiff's Exhibit 9), plaintiff as a seasonal employee should have been given preference over Mr. Davis who, at the time of the creation of the Relief Utility Man's position, was, in effect, a new hire.

Taken in balance, this court is of the view that defendant has failed to establish a legitimate, non-discriminatory reason for not hiring plaintiff as a Relief Utility Man. The defendant placed Mr. Davis, a black, into the Relief Utility Man job in spite of the fact that he had no seniority rights after lay off, or if he was still employed, less seniority than plaintiff. This was further done by defendant in spite of the fact that Mr. Davis was determined unacceptable by Dr. McClead who supposedly had the knowledge and experience to choose acceptable candidates for positions at the Humane Shelter.[10]

In reviewing the evidence as a whole, the court is persuaded by plaintiff's argument that he did not receive a position with the Humane Shelter because of the fact that he was white. Recognizing that plaintiff, as the moving party, retains the burden of persuasion, and defendant need only articulate a legitimate, non-discriminatory reason for the non-hiring of plaintiff, see, e.g., U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the court remains convinced that, in light of all the evidence, defendant's proffered justification for plaintiff's non-hiring must fail. A review of the evidence is as follows.

When the Kennel Worker position first appeared, four seasonal park employees applied—two of whom were white, two of whom were black. When it came time for the interview with Dr. McClead, plaintiff was forced to "clock out" from work early and ride his bicycle while the black employees were "chauffeured" to the interview in a Park Department truck. Ultimately, both of the black applicants would receive positions with the Humane Shelter.

While this court finds that Dr. McClead's assessment that plaintiff was "nervous" constitutes a legitimate reason for not finding plaintiff qualified for the Kennel Worker position, it does nothing to rebut plaintiff's assertion that he was otherwise qualified for the Relief Utility Man position. This is so because a Kennel Worker was expected to aid in the euthanasia of animals and, in doing so, a calm demeanor was necessary. The job description for a Relief Utility Man's position, however, did not indicate that such an employee would assist in the euthanasia of animals and thus, the need for a calm demeanor was not apparent.

To the contrary, plaintiff was wholly qualified for the Relief Utility Man position. Plaintiff's own testimony indicated that he had, during high school, worked at a pet shop, and, had owned numerous dogs, both large and small, which would seem to indicate that plaintiff had familiarity with dogs and he was not "afraid" of those animals. The qualifications of the other applicants who applied for those positions was not made known to the court except to the extent that Mr. Davis had a tenth grade education and a valid driver's license. Why defendant would not choose to make those qualifications known to the court remains unclear, but without such clarification, the court is at a loss to understand why plaintiff would not receive such a position.

---

**10.** In reaching this conclusion, the court is aware of defendant's argument to the effect that plaintiff was unacceptable because he had a conviction for possession of marijuana back in 1973. That argument appears to have been made in retrospect. Moreover, plaintiff's record does not appear to be any less stellar than that of Mr. Davis who had been discharged from Tokeim Corp. for, *inter alia,* falsifying company records; excessive absenteeism; and falsifying doctor's reports to the company. (Plaintiff's Exhibit 14). Insofar as a criminal record may have precluded plaintiff from being promoted to a Humane Officer (which by statute has powers analogous to police officers), it is irrelevant.

Exactly why plaintiff was not hired as a Relief Utility Man remains a mystery to the court. He was certainly qualified—more so than Mr. Davis. He certainly had seniority—also more so than Davis. The only conclusion to be drawn from all of the circumstances is that race was a motivating factor in the non-hiring of plaintiff. That is, defendant has failed to rebut the inference that race was a motivating factor in the non-hiring of plaintiff to the Relief Utility Man position by setting forth a legitimate, non-discriminatory reason. Accordingly, plaintiff has established that he was discriminated against on the basis of race and judgment must be entered in this favor.

▇ Having determined liability in favor of the plaintiff, the court now turns to the question of damages. Generally, a determination under Title VII that defendant has discriminated against plaintiff would require that defendant hire plaintiff, *see Paxton v. Union National Bank,* 688 F.2d 552, 574 (8th Cir.1982); *Danner v. Phillips Petroleum Co.,* 447 F.2d 159, 162 (5th Cir. 1971), but in this case, plaintiff has apparently abandoned such a claim insofar as the pre-trial order in this cause and the trial brief seek damages, but do not request that plaintiff be hired. True, the complaint filed in this cause was voiced in terms of hiring, back pay and damages. But since the pre-trial order merges the pleadings in this cause, the court is left with the conclusion that plaintiff no longer seeks to be hired by defendant. *See, e.g., Flannery v. Carroll,* 676 F.2d 126, 129 (5th Cir.1982); *Ramada Development Co. v. Rauch,* 644 F.2d 1097 (5th Cir.1981); 6 Wright & Miller, *Federal Practice and Procedure* § 1522 (1981).

Aside from hiring, however, it is altogether clear that a prevailing plaintiff in a Title VII suit is entitled to an award of back pay. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Such a back pay award includes fringe benefits which would have been received as an employee. *Bowe v. Colgate-Palmolive Co.,* 489 F.2d 896 (7th

Cir.1973). Once a determination has been made as to the gross amount of back pay owed, the burden shifts to defendant to prove "what should be deducted from that award as '[i]nterim earnings or amounts earnable with respect to reasonable diligence' 42 U.S.C. § 2000e–5(g)." *Paxton, supra,* at 574; *see also Orzel v. City of Wauwatosa Fire Dept.,* 697 F.2d 743, 756 (7th Cir.1983); *Sangster v. United Airlines, Inc.,* 633 F.2d 864 (9th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981).

Notwithstanding this court's conclusion that plaintiff is entitled to a back pay award, it is difficult at this juncture to assess the exact amount of such an award. This is so because of the fact that while plaintiff proffered what he deemed to be the appropriate calculations and defendant in cross-examination whittled away at those calculations, this court is unable to determine exactly what those figures mean with respect to the ultimate amount of damages. It is expected that the parties should be able to stipulate to the appropriate figures, and the court expects that they can file an appropriate stipulation so that damages may be assessed. If, however, the parties are unable to reach an accord on the amount of damages, the court will set the matter for a hearing.

Within twenty (20) days from the date of this order, the parties are to submit any stipulation they can reach regarding damages. At that time the parties are invited to submit further briefs on the issue of damages. Should the parties be unable to reach an accord with respect to damages, the court will set the matter for a hearing.

▇ Plaintiff also seeks costs and attorney fees in this action. Section 2000e–5(k), Title 42 of the United States Code, provides that in any Title VII proceeding, the court may allow the prevailing party a reasonable attorney fee as part of the costs. The court finds that costs and attorney fees should be assessed against defendant in this action. The considerations relevant to computing reasonable attorney fees have been set forth by the United

States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Time spent by the attorney is not to be simply multiplied by a billing rate. The primary factors in the computation include not only the time reasonably spent on the case, but also the value of the attorney's work, given local legal fees, and his abilities, reputation and degree of success in the case. Also relevant is whether the attorney's efforts in this case precluded him from working on other legal matters. These factors are drawn from the section of the Code of Professional Responsibility that describe how an attorney should determine the fee he may properly charge a client.

While plaintiff's request for an award of costs and attorney fees will be granted, the court cannot at this time, on the showing before it, compute the proper amount of an award. The plaintiff will therefore be directed to file a complete breakdown of charges and time and such other material supporting the request for attorney fees for this case as required by *Waters v. Wisconsin Steel, supra.* The amount of such an award will be set by further order of the court. A copy of plaintiff's showing relating to attorney fees shall be served on defendant, and defendant shall have ten (10) days from the date of filing to respond or otherwise challenge the showing and fee set forth.

This Memorandum of Decision contains the court's Findings of Fact and Conclusions of Law pursuant to rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).

### Conclusion

The plaintiff has established by a preponderance of the evidence that defendant's refusal to hire him was an act of discrimination. Accordingly, a violation of Title VII has been shown, thus entitling plaintiff to recover.

To remedy the violation, the court FINDS and ORDERS the following. Plaintiff is entitled to back pay, costs, and attorney fees. It is FURTHER ORDERED that the parties are to attempt to arrive at a stipulation with respect to damages within twenty (20) days of the date of this judgment. Should the parties be unable to reach agreement, the matter will be set for hearing.

With respect to attorney fees, plaintiff is ORDERED to file a complete statement of charges and an affidavit of counsel in support of his request for attorney fees within ten (10) days after the date a damages stipulation has been reached or this court rules upon the damage issues. A copy of plaintiff's showing relating to attorney fees shall be served on defendant and defendant shall have ten (10) days from the date of filing to respond or otherwise challenge the showing of fees set forth.